## SNELLING, assignee, *v.* ARBUCKLE BROTHERS.

1. Though an instrument may in general form and as to many of its details contain language characteristic of a del credere commission, it should nevertheless be construed and treated as a contract for the sale and purchase of goods when it stipulates as follows:  (1) That the consignee "shall guarantee the sale of each consignment and the payment therefor within sixty days from its date."   (2) That he shall remit to the consignor "the full amount of each consignment, less commissions,  . . by the end of such sixty days, at a price designated,  . .   whether the whole of said consignment shall have been sold by [the consignee] or not, and whether or not [he] shall have collected the proceeds thereof."   (3) That the consignee shall take the risk of any decline in the market price of the goods consigned to him, and shall have the benefit of any advance in such price.   (4) That the consignee shall be allowed specified discounts on payments made to the consignor in advance of the expiration of the

sixty days.  (5) That in case of his failure to remit by the end of such sixty days the consignor may draw upon him for the amount due.

2. Where one who had sold, on open accounts, goods consigned to him under such a contract failed and made a general assignment for the benefit of his creditors, the consignor was not entitled to maintain against the assignee an action for the money collected by him on such accounts; but the same, being in law assets of the failing consignee, should be disposed of as such by the assignee.

Argued February 2, — Decided May 26, 1898.

Complaint.  Before Judge Felton.  Bibb superior court. April term, 1897.

Arbuckle Brothers sent coffee to Allen under a contract whereby they appointed him a special selling factor of the coffee, restricting and defining his duties and obligations by the following provisions:

"I.  That all goods consigned on your requisitions on us shall, until sold in regular course of business and to bona fide retail customers, remain our property with the title in us, and shall merely be held by you as our factor, and shall at all times be subject to our order for disposal or removal on payment of all claims against them for advances of money made to us, and all charges for drayage, storage, and insurance.

"II.  That you shall never purchase such goods for your own account.

"III.  That such goods shall be sold and billed by you in your own name, but only as our factor, according to the laws relating to factors, and only at such prices and on such terms as we may give you from time to time.

"IV.  That you shall guarantee the sale of each consignment and the payment therefor within sixty days from its date, and shall assume all risk as to the credit of the parties to whom you sell, and make all collections for goods sold at your own expense.

"V.  That you shall remit us the full amount of each consignment, less the commissions as herein provided, by the end of such 60 days, at a price designated to you at the time of the consignment, whether the whole of said consignment shall have been sold by you or not, and whether or not you shall have collected the proceeds thereof.

"VI. That you shall insure us against any decline in the price of the unsold goods held by you as our factor.

"VII. That you shall be entitled to any benefit of any advance in price of such unsold goods; and

"VIII. That you shall be entitled to the following allowances and commissions, to wit:

"1. For carting and storing, 1/8 cent per pound.

"2. For insurance against fire, wind and water, 1/8 cent per lb.

"3. For insuring payment, 1/8 cent per pound.

"4. For insuring against decline in price, 1/8 cent per lb.

"5. For selling the goods, 1 cent per pound.

"IX. That in addition to the above, we shall, on all advances made to us prior to ten days from date of consignment, allow a discount of 1 per cent., and, on advances made after ten days but prior to sixty days, we shall allow interest at the rate of six per cent. per annum, from the time between the date of said advance and said sixty days.

"X. That if you neglect to remit to us the full amount of any consignment, less the commissions as herein provided, by the end of sixty days from its date, we shall make draft upon you and allow you a selling commission of only 1/2 of one cent per pound; and if said draft be returned unpaid, we shall only allow you a selling commission of 1/4 of one cent per pound; and if you do not remit us within four months from date of each consignment, no commission or discounts of any nature whatever will be allowed.

"XI. That you shall maintain our established selling price, terms, conditions, and limitations of consignment in such States and Territories as may be designated by us; but in the event of any violation thereof, you are to pay us the sum of fifty dollars ($50.00) for every such violation.

"XII. That this factor appointment may be revoked by us at any time at our option."

Allen sold the coffee to his customers. Certain of these sales were not paid for when he made a voluntary assignment for the benefit of creditors, after which the assignee collected from Allen's debtors certain moneys due for the purchase-price of

goods obtained under said contract and sold before the assignment was made.   Upon the trial of a suit brought by Arbuckle Brothers against the assignee, the foregoing facts appeared; and the case having been submitted to the judge without a jury, he ordered the money in the hands of the assignee, arising from such collections by him from Allen's debtors, to be paid over to plaintiffs, and refused to allow him to pay the money as directed by the deed of assignment, under which A. B. Small was the next creditor in the order of preferment.   It was agreed that the assets of Allen were not sufficient to pay all the debts, and not sufficient to reach the debt of plaintiffs in the order of preferment under the deed of assignment.   The ruling of the court is assigned as error.

*Hardeman & Moore*, for plaintiff in error.
*Hardeman, Davis & Turner*, contra.

FISH, J.   The case turns upon the proper legal construction to be given the written agreement or contract between Arbuckle Brothers and Allen.   If, as contended by the defendants in error, the legal effect of the paper in question is to create between the parties thereto the relation of principal and factor, the latter selling the goods of the former under a del credere commission, then Arbuckle Brothers are entitled to the funds in the hands of Allen's assignee, arising from accounts against customers to whom Allen had sold goods consigned to him by the Arbuckles.   If, on the other hand, this paper, properly construed, rendered the relation of the parties that of vendor and purchaser, then Arbuckle Brothers were not entitled to the proceeds of these accounts.   The contract is certainly a very extraordinary one and contains seemingly contradictory provisions.   Some of its stiplations, if construed only in connection with others of a kindred nature, seem to indicate the creation of a del credere agency.   Other stipulations, taken in connection with those which readily harmonize with them, clearly show a contract of sale.   It appears to have been drawn for the purpose of enabling Arbuckle Brothers to "run with hare" or "hold with the hounds," according as, in the exigencies of a given case, their interest might dictate.   On the one hand, to

hold Allen absolutely bound, in any event, to pay for all goods shipped to him by the Arbuckles; on the other hand, in the event of his failure to pay and his insolvency, to enable them to successfully claim all unsold goods in Allen's possession and the accounts, or their proceeds, against his customers, representing goods which he had sold but for which he had not paid Arbuckle Brothers. The contract must be construed in the light of all of its provisions, and the legal outcome of its several stipulations, construed together, must control its classification. The mere name which may have been given to it by the parties thereto can not change the legal effect of its stipulations. In Heryford *v.* Davis, 102 U. S. 235, the Supreme Court of the United States construed a written contract between a car-manufacturing corporation and a railroad company to be a sale, notwithstanding the fact that the contract, in the language of the court, "industriously and repeatedly spoke of loaning the cars to the railroad company *for hire* for four months, and delivering them for use *for hire*." Mr. Justice Strong, delivering the opinion of the court, said : "What, then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provisions it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account." See, also, *Hays* v. *Jordan*, 85 *Ga.* 741; Cowan *v.* Singer Mfg. Co., 92 Tenn. 376; Singer Mfg. Co. *v.* Cole, 4 Lea, 439, s. c. 40 Am. Rep. 20.

Under the fifth clause of this contract, Allen was bound to remit to Arbuckle Brothers, at fixed times, the full price of each consignment, without regard to payments made to him by the customers to whom he sold the goods, or the terms upon which he sold to such customers, and without regard to whether *any sales* had been made by him or not; and he was bound, at such fixed times, to remit to the Arbuckles at a price fixed by them to him at the time when the goods were consigned to him. Allen's obligation, then, was radically different from that of a mere del credere agent; for he did not simply guarantee to

Arbuckle Brothers that the customers to whom he sold their goods, on a credit, should pay them, through him, as their agent, the price for which the goods were sold to such purchasers, but he agreed, at the expiration of sixty days from each consignment, to remit to Arbuckle Brothers full payment for the entire consignment, regardless of the question whether the goods of which such consignment consisted had been sold by him or not. If none of the goods of such consignment had been sold by Allen, he was just as much obligated to pay Arbuckle Brothers for them, *at a price fixed by the latter at the time of the consignment*, as he would have been if he had, in fact, sold all of the goods contained in the consignment. In keeping with and as if to emphasize this clause of the agreement, the tenth clause expressly stipulated that if, at the expiration of sixty days, Allen had not paid for the goods, the Arbuckles should have the right to draw on him for the price of the same. What stronger feature of a sale on sixty days time can there be than a stipulation which renders the consignee, from the moment the goods are received by him, absolutely and unconditionally bound, at the end of that time, to pay for them at a price fixed at the time they are consigned. As if the provisions which we have just been discussing were not enough to hold Allen bound, under any and all circumstances, to pay for the goods at the price fixed when they were consigned to him, the sixth clause provided that he was to insure Arbuckle Brothers against any decline in the price of the goods. So if the market price fell the loss was Allen's and not that of the Arbuckles. And, as if to balance this provision, the seventh clause provided that if the goods advanced in price Allen was to have the benefit of such advance. So if the market price rose the profit was Allen's and not that of Arbuckle Brothers. Why should Allen assume the risk of any decline in the price or market value of the goods if they belonged to Arbuckle Brothers? Why should he be entitled to the benefit of any increase in the price or value of the goods, if they did not belong to him? Why should he be compelled to pay for the goods at the end of sixty days, whether he had sold them or not, if he was simply an agent to sell the goods for the consignors? These earmarks indicate a sale, and,

taking them together, it is very difficult, notwithstanding the apparently conflicting provisions of the instrument, to escape the conclusion that such is the legal effect of this contract.

When we further consider that no account of sales was to be rendered by the so-called "factor" to his alleged principals; that he was not required to furnish to them the names of the parties to whom he sold upon a credit and the terms of the credit which he extended, nor to report or transmit to them the evidences of indebtedness, if any, which he received from such customers; that no matter how much cash he might accumulate from sales within the sixty days, he was under no obligation to remit it to them until the sixty days had elapsed, and then was bound to remit, not simply as a del credere agent accounting to his principals for the money of such principals in his hands and for the amount of matured indebtedness against customers who had failed to meet their obligations, but to remit the whole amount of the entire consignment; and that discounts, such as are usual in cases of sales upon time, were to be allowed upon all bills paid before the expiration of sixty days from their dates, the conclusion seems unavoidable that the true legal relation between the parties to this agreement was that of vendors and vendee. The stipulation that the title to the goods should remain in the Arbuckles until Allen had paid for them is not inconsistent with a contract of sale. It might make the sale, as between the parties, to that extent conditional. The seller of personal property often stipulates that the title thereto shall remain in him until the purchase-price is paid. As Allen wanted the goods for the purpose of reselling them at retail to his customers, if the stipulation had gone to this extent it would have seriously hampered his business and caused him to lose the benefit of the sixty days credit extended to him. The stipulation in question may, therefore, be treated as simply an effort on the part of the vendors to retain the title until the vendee had either sold the goods or paid for them, the retention of title, by express provision, ceasing when he sold the goods, and by necessary implication ceasing when he paid for them. Nor is the fact that Allen was to sell the goods at prices fixed by Arbuckle Brothers

necessarily inconsistent with the idea of a sale. It is not very uncommon in these times for the manufacturer of a certain article to endeavor to fix the price at which it shall be sold at retail by the merchants who purchase it for that purpose. This effort on the part of the manufacturer is doubtless for the purpose of establishing a uniform price applicable to all markets, and to prevent competition between the retailers. Coming now to stipulations and expressions which really seem to conflict with the idea of a sale, how futile to call the instrument in question a "special selling factor appointment," and in its opening sentence to "appoint" Allen a "special selling factor," when under its provisions he is bound as a purchaser. Of what avail was it to introduce provisions which, taken by themselves, indicate the creation of a del credere agency, and yet to bind the so-called "factor" to pay for the goods whether he ever sold them or not? Of what use was it to declare in one clause that Allen should never become a purchaser of the goods consigned to him, when in a subsequent clause it was stipulated that he should pay for them, at the end of sixty days, at a price fixed at the time of the consignment? The latter clause annihilates the former. As is well said by Mr. Justice Strong, in Heryford v. Davis, supra, "It is quite unmeaning for parties to a contract to say it shall not amount to a sale, when it contains every element of a sale, and transmission of ownership."

Probably the leading case among cases of this character is that of Ex parte White, L. R. 6 Ch. 397. In that case there was no written contract, but the course of dealing between the parties showed that Towle & Co., who were cotton-manufacturers, consigned goods of their manufacture to Alfred Nevill, accompanied by a price-list, and he sent them monthly an account of the goods which he had sold, debiting himself with the price specified in the price-list, not specifying the particular contracts, nor giving the names of the purchasers, nor the price at which, nor the terms on which, he had sold the goods; and in the next month he paid to Towle & Co. the moneys which were due to them in respect of the sales thus accounted for. He frequently had the goods bleached or dyed before he sold them, but gave no account to Towle & Co. of the expense. In

discussing the nature of the relation between the parties, under this course of dealing, James, L. J., said: "The case seems very analogous to one suggested by Mr. De Gex in the course of the argument. If a publisher publishes for an author, and sells for the author, and holds all the copies of the book, and at some specified time has to return to the author an account of all those sold, and pay for them at a price fixed between the author and the publisher, the publisher being at liberty to make his own bargains with retail booksellers all over the country, it could never be supposed that the relation of creditor and debtor or vendor and purchaser ever existed between the author and the retail booksellers. I have not the slightest doubt that a great quantity of 'agency business' is carried on in the same way in the country, and that there are large dealers who have agents in all the towns of Great Britain and Ireland. Possibly they may say: 'We will give you the goods; you shall be the sole person whom we supply in a particular district, and we shall not call upon you to pay until you have disposed of them. You are at liberty to sell upon your own terms; we have nothing to do with the persons with whom you deal, but we look to you to pay at your trade prices for the goods you sell. You must return the sales that you have made up to certain times; we will give you a certain credit, but when that has expired, we look to you to pay us the cash.' That is a very reasonable bargain, and that is the kind of bargain which, in my opinion, the course of dealing shows to have existed in this case; and if so, how is it possible to say that the proceeds of the sales were trust moneys in the hands of Mr. Nevill? Mr. Nevill was not to pay immediately; and if he sold for cash, it seems to me impossible that Towle & Co. could have any right to say: 'You have sold the goods for cash; therefore hand over the moneys to us at once.' Nevill would have said, 'No, the bargain between us is that I am to give you an account at the end of the month, and to pay you at the end of another month. My selling for hard cash does not alter the nature of the bargain between you and me, or entitle you to call upon me to hand the moneys over to you, or to put the moneys in medio and keep them for you. The proceeds of sale were his own moneys, and

not trust moneys, and he was at liberty to deposit them with a banker, or deal with them as he pleased."

How aptly the Lord Justice's illustration of the impossibility of the existence of any right in Towle & Co. to demand the proceeds of cash sales from Nevill applies in the case at bar. To such a demand upon the part of Arbuckle Brothers Allen could have replied: "No, under the bargain between us, I am not to give you any account of sales at all. I am simply to pay you for the goods at the end of sixty days. 'My selling for hard cash does not alter the nature of the bargain between you and me, or entitle you to call upon me to hand the moneys over to you, or to put the moneys in medio and keep them for you.'" In the same case from which we have quoted, Mellish, L. J., said: "It is quite clear that Nevill, if he sold these goods, was to pay Towle & Co. for them, at a fixed price —that is to say, a price fixed beforehand between him and them—and at a fixed time. Now, if it had been his duty to sell to his customers at that price and to receive payment for them at that time, then the course of dealing would be consistent with his being merely a del credere agent, because I apprehend that a del credere agent, like any other agent, is to sell according to the instructions of his principal, and to make such contracts as he is authorized to make for his principal; and he is distinguished from other agents simply in this, that he guarantees that those persons to whom he sells shall perform the contracts which he makes with them ; and therefore, if he sells at the price at which he is authorized by his principal to sell, and upon the credit he is authorized by his principal to give, and the customer pays him according to his contract, then, no doubt, he is bound, like any other agent, as soon as he receives the money, to hand it over to the principal. But if the consignee is at liberty, according to the contract between him and the consignor, to sell at any price he likes, and receive payment at any time he likes, but he is bound, if he sells the goods, to pay the consignor for them at a fixed price and at a fixed time,—in my opinion, whatever the parties may think, their relation is not that of principal and agent. The contract of sale which the alleged agent makes with his purchasers

is not a contract made on account of his principal, for he is to pay a price which may be different, and at a time which may be different, from those fixed by the contract. He is not guaranteeing the performance, by the persons to whom he sells, of their contract with him, which is the proper business of a del credere agent; but he is to undertake to pay a certain fixed price for those goods, wholly independent of what the contract may be which he makes with the persons to whom he sells; and my opinion is that, in point of law, the alleged agent in such a case is making on his own account a contract of purchase with his alleged principal, and is again reselling." This decision was affirmed by the House of Lords, sub nom. Towle v. White, 21 Wk. R. 465. We have quoted at some length from this case, because it has been regarded as very high authority by the courts in this country and has been often cited and followed. While there were some features indicating a sale in that case which are not in the present one, we regard the features in this case which indicate a sale, taken all together, as being really stronger than those of a similar character in the case decided by the English court. We think that the single fact in the case at bar that Allen was bound to pay for all goods which he received from the Arbuckles, whether he ever sold them or not, outweighs any facts indicating a sale in that case which are not found in this one.

The case of Ex parte White was relied upon in Nutter v. Wheeler, 2 Low. Dec. 346, in which the facts were these: "The defendants were manufacturers of machinists' tools at Worcester, and Gear had a shop in Boston, where he sold such tools, among other things. The defendants were in the habit of sending their manufactured goods to Gear, and he sold them at such prices and to such persons and on such terms as he pleased, not less than the trade prices fixed by the defendants; whenever he sold any tools, and not before, he was to pay the defendants, in thirty days, the prices shown in the list, less an agreed discount. The defendants had the right to sell any goods which at any time remained in his shop unsold, and he was permitted to sell any of their goods at the factory, and the defendants would then deliver them according to his order,

and charge him with the trade price less the discount. Instead of paying in thirty days, Gear would sometimes give his note for the balance due; and the defendants held one such note at the time of his bankruptcy." With reference to the goods sent to Gear at Boston, Lowell, J., said: "Until a sale was made, the property in the goods remained in the defendants, and they were well justified in reclaiming those which remained on hand at the time of the failure of Gear. But after the goods were sold, the agreement appears to have been that Gear's credit only was looked to. Perhaps there were conveniences in this mode of conducting the business. Whatever profit or loss Gear might make, or whatever credit he might give, the defendants had a fixed price and a fixed time of payment. He never consulted them about his sales, or rendered any account of sales. The prohibition against selling below the trade price is a very common one between a manufacturer and those who buy of him to sell again, and is intended to prevent a ruinous competition between the sellers of the same article. I have often known this arrangement to be made by a patentee and his various licensees. It has but little tendency to prove agency." On this point the court finally said: "If the relation of the parties was such as I have considered it, then, even as to the goods which had once been consigned to Gear, he should be considered as the purchaser, subject only to the understanding that he was neither the owner of them, nor liable to pay for them until he had succeeded in finding a purchaser; but when he did sell, he immediately became the principal, and the defendants ceased to have the rights of a consignor, and could not follow the goods or their proceeds as undisclosed principals." These cases were followed In re Linforth, 4 Sawyer, 370. Speaking of this last case, Chief Justice Bleckley, in *National Bank* v. *Goodyear*, 90 *Ga.* 727, said: "The agreement was that the consignees would give their notes at sixty days from the dates fixed for rendering account of sales, and thus settle for all goods sold or shipped from their warehouse, and with this further stipulation: to settle for such goods as might be on hand at the expiration of the year for which the contract was to run, by giving their note payable

in six months, if so required. The great fact which seems to characterize this case is, that the consignees made themselves liable to pay ultimately for the goods whether they were sold or unsold when the term of consignment expired, if the consignors so required. This would entitle the consignors to exact payment for unsold goods, and thus force the consignees to retain them as purchasers." The great fact which characterizes the case now under consideration is, that Allen made himself unconditionally liable to pay for the goods, at the end of sixty days, "whether they were sold or unsold"; and his liability was absolute from the moment he received the goods, the consignors not being obliged to do anything, after that time, to force him to retain them as a purchaser. In Ætna Powder Co. *v.* Hildebrand, 137 Ind. 462, the court held that, "Where by the terms of a contract goods are consigned by one person to another to sell as agent upon commission, the latter to guarantee all sales, and to make a report at the end of each sixty days of the amount of sales, and to pay for the same, less commissions, with his sixty-day note, the proceeds of sale vest in the consignee, and the relation of debtor and creditor arises as to the proceeds of the goods sold, whether the notes stipulated for be executed or not, and upon the insolvency of the consignee the consignor is not entitled to follow such proceeds as a trust fund, but can only proceed as a common creditor." Without citing other authorities which tend to support the conclusion which we have reached, we are clearly of opinion that the moneys in controversy, in the hands of Allen's assignee, can not be followed by the defendants in error as trust funds; and the judge below erred in ordering the same to be turned over to them.

It was not until this court had arrived at its conclusion, and the above opinion had been written, that it came to our knowledge that an instrument the provisions of which were identical, in every respect, with the one which we have been considering, had been recently construed by the Supreme Court of Tennessee, in Arbuckle Bros. *v.* Kirkpatrick & Co., 98 Tenn. 221. In that case Kirkpatrick & Co. had failed, and assigned all their accounts, goods on hand, etc., to certain assignees, to pay sev-

eral classes of creditors. Among the property assigned were sums due to Kirkpatrick & Co., for coffee sold by them, which they had procured from Arbuckle Bros. under this contract or agreement. Just as in the present case, the Arbuckles sought " to follow into the assignees' hands all unpaid accounts created for sales of Arbuckle coffee," claiming that such indebtedness ' belonged to them, because created upon sales of their goods by their factors. It increases our confidence in the correctness of the view which we have taken of the question presented, to know that the highest court of our sister State has decided it in the same way. The construction which that court placed upon the agreement in question is expressed in the third head-note to the case as follows : " A contract of sale transferring the title of the goods, and not a mere agency, is made by an agreement called 'special factor appointment,' under which the consignee is required to pay for the goods within sixty days, whether sold or not, at an amount fixed in advance, with certain allowances for carting, storing, insuring, and selling, whether the goods are carted, stored, insured, or sold or not, without requiring the consignee to make any account of sales or to keep the proceeds separate, but giving him all the advantage and risk of the advancement or decline of prices." In concluding the opinion, the court said : " We are of opinion that complainants [Arbuckle Brothers] can not collect from customers of Kirkpatrick & Co., but must look alone to them, and not to purchasers from them ; and we are also of opinion that under the peculiar provisions of this contract the relation of complainants to Kirkpatrick & Co. was that of vendor to vendee, at least as to outsiders, and persons to be affected by the relation, no matter what the parties may have agreed or intended as between themselves. The contract is certainly a remarkable one, partaking in many of its provisions of a contract of agency and in many others of a sale. It is evidently intended as either or both, as might suit the convenience or subserve the purposes of the complainants. It purports to be copyrighted ; for what reason is not stated, but the copyright is evidently procured on account of the unusual and extraordinary provisions of the instrument (if there be a copyright). In construing

such a contract, whenever it affects the rights of others it will be so construed as to protect such rights, and not to. enable the complainants to carry out any double purpose.   In view of its uncertainty and contradictory provisions, the court will see that third persons are not prejudiced by its construction."

*Judgment reversed.   All the Justices concurring.*