HANDLAN BUCK MANUFACTURING COMPANY, Appellant, v. STAVE ELECTRICAL COMPANY, Respondent.

St. Louis Court of Appeals, December 31, 1913. Opinon Modified and Motion for Rehearing Overruled July 2, 1914.

1. **CONTRACTS: Construction.** The intention of the parties to a written contract is to be gathered from the entire contract, and not from isolated portions of it; and all of its provisions

are to be read together, and, if possible, so construed as to harmonize them.

2. PRINCIPAL AND AGENT: Right of Agent to Return Goods: Construction of Contract. A contract provided that plaintiff should have the exclusive right to sell defendant's lamps throughout designated territory, for six months, with a privilege of renewal for six months, if, during the first six months, plaintiff sold a certain number of lamps. It also provided that plaintiff should sell the lamps at a specified list price and receive its compensation by a discount. Plaintiff was required to establish subagencies and to immediately order twelve sample lamps, which he was to pay for within thirty days from the date of shipment, and he agreed to pay for future orders within the same time. Defendant agreed to ship lamps on consignment, for approval, as plaintiff requested, and that if, at the expiration of the first term of the contract, plaintiff should decide to discontinue the same, defendant would take back such lamps and parts as plaintiff had on hand, provided plaintiff paid freight both ways. In an action by plaintiff to recover the amount paid for lamps ordered from defendant, which plaintiff offered to return, *held* that the contract created a selling agency, and that the right to return, on a discontinuance of the contract by plaintiff, upon the expiration of the first term, was not limited to lamps sent out on consignment, but also included the twelve sample lamps purchased by plaintiff.

3. ———: ———: ———. Under a contract between plaintiff and defendant, by which plaintiff was appointed agent for the sale of defendant's goods for six months, with the privilege of renewal by him, and which provided that if, at the expiration of the first term of the contract, plaintiff should decide to discontinue the same, defendant would take back such goods as he had on hand, it was not necessary that affirmative action be taken by plaintiff to "discontinue" the contract, but, by its express terms, it became inoperative at the end of the six month period, if not continued in force, so that, at the end of that period, defendant was obligated to take back the goods and return the money paid by plaintiff therefor, unless the contract was renewed or otherwise continued in force.

4. ———: ———: Delay. Where a sales agency contract required the principal to accept a return of goods in the hands of the agent at the end of the first term, if the contract was not renewed, he was not relieved from the obligation to accept a return of such goods by reason of the agent's delay in tendering them, where the principal not only acquiesced in the delay, but took the position that such goods had been sold to the agent and were not subject to return, so that a tender would have been unavailing.

5. **TENDER: Excuse for Not Making.** It is not necessary to make a tender, where, if made, it would be unavailing.

6. **PRINCIPAL AND AGENT: Right of Agent to Return Goods: Renewal of Contract: Jury Question.** In an action by an agent to recover money paid for sample goods, which the agent offered to return to the principal, under a contract appointing the agent for six months, with the privilege of renewal by him, and providing that if the agent should, at the expiration of the first term of the contract, decide to discontinue the same, the principal would take back such goods as the agent had on hand, evidence *held* to require submission to the jury of the question whether the contract was continued in force after the expiration of the first term, in which event the agent would not be entitled to recover.

7. **APPELLATE PRACTICE: Binding Effect of Theory at Trial.** Where defendant's counterclaim sought a recovery, and the issues raised by it were tried, on the theory of a conversion of lamps which had been consigned to plaintiff, *held* that defendant would not be allowed to take the position in the appellate court that his counterclaim did not charge a conversion, but asserted a claim for damages for the breach of an agreement to return the lamps.

8. **CONVERSION: Principal and Agent: Return of Goods by Agent.** Where goods consigned to a selling agent for display at a convention were at all times treated by both parties as consigned goods, and the agent would have returned them to the principal, on demand, had it not been for the fact that the latter's demand therefor was coupled with a demand that the agent pay storage charges that had accrued thereon, the agent's continued possession of the goods, on refusing to pay such charges, while awaiting shipping directions and payment of the charges by the principal, did not constitute a conversion.

9. ———: **Evidence of Conversion: Demand of Possession: Sufficiency.** Where one is entitled to the immediate possession of personal property, a demand therefor and a refusal to surrender possession constitute prima-facie evidence of a conversion; but the demand must be peremptory and clothed in absolute and unequivocal terms.

10. ———: ———: ———: ———. A contract between plaintiff and defendant, by which plaintiff was appointed agent for the sale of defendant's lamps, obligated plaintiff to order twelve sample lamps and obligated defendant to consign lamps to plaintiff's customers for trial, and provided that, at the expiration of the contract, defendant would take back such goods as plaintiff had on hand. In an action by plaintiff to recover

the amount paid for the sample lamps, it was shown that plaintiff desired to return the consigned lamps, but defendant at first declined to receive them, unless certain storage charges were paid, and refused to receive a return of the sample lamps on the ground that they had been sold to plaintiff. Subsequently, defendant expressed a willingness to take back the consigned lamps, to which plaintiff replied by citing the contract provisions, giving it the right to return all the lamps. *Held*, that, under the circumstances, defendant's notice of its willingness to accept a return of the consigned goods was not such a demand therefor as would constitute plaintiff's continued possession thereof a conversion.

11. ————: **Necessity of Demand: Statute.** Sec. 2283, R. S. 1909, providing that it shall not be available as an objection that no demand for the subject-matter of the suit was made prior to the institution thereof, unless it is expressly pleaded by way of defense and is accompanied with a tender of the amount due, etc., has no application to an action for conversion of personal property.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields,* Judge.

REVERSED AND REMANDED (*with directions*).

*Leahy, Saunders & Barth* for appellant.

(1) A party to a lawsuit is bound by the theory upon which he tries the case below. Mirrielles v. Railroad, 163 Mo. 470; McQuillin on Instructions to Juries in Missouri, Civil Cases, sec. 294. (2) In this case respondent took the position that the contract was continued at the end of six months unless it, respondent, elected to discontinue it at that time, despite the fact that the contract itself provided that it should terminate at the end of six months with an option to appellant to renew, provided appellant had sold one hundred and fifty lamps during the said six months, the proof being that it had not sold one. (3) There is no evidence in the record that the contract was renewed at the end of six months. (4) The written and undisputed evidence shows that appellant tendered

back to respondent all the lamps in its possession and offered to pay the freight both ways, and respondent declined to accept this tender.   (5)   Both parties took the position that under the contract appellant had the right to tender back the original twelve lamps shipped to it, and to recover back the purchase price, but respondent insisted that such tender must be made within a reasonable time after February 5, 1910, the date of the termination of the contract.   Since both parties concède that appellant had the right to return the twelve lamps under the contract, and demand back the purchase price, the contract requires no construction on that point.   Where both parties have construed a contract, the court will generally adopt the construction so given it.   Rose v. Carbonating Co., 60 Mo. App. 28; Williams v. Railroad, 85 Mo. App. 103.   In the instant case both parties took the position that appellant had the right to tender back the twelve lamps originally shipped to it, upon prepayment of the freight both ways.   (6)   Instructions given for respondent, and the modifications by the court of appellant's instructions, are all erroneous, because practically all of them declared to the jury that respondent had the right to discontinue the contract at the end of the first six months, and ignored the automatic termination thereof under its express terms.   Furthermore, the court undertook, in instruction number 20, to submit to the jury the construction of the contract, having first declared, in instructions numbers 18 and 19 for defendant, its alleged meaning, and again, in instruction number 21, assumed the fact that plaintiff refused to return to defendant the consigned lamps and then undertook, in the same instruction, to submit to the jury the question whether plaintiff had so refused.   The instructions in this case are contradictory, confusing and misleading and wholly unsupported, either by the contract or the record.   The court converted an experimental agency contract into an abso-

lute purchase by appellant from respondent of twelve lamps consigned for agency purposes, and of twenty more lamps with equipment consigned to appellant at Denver for exhibition purposes at the American Street & Interurban Railway Manufacturing Association convention. (7) It was the duty of the court to construe the written contract. Brannock v. Elmore, 114 Mo. 55. The construction of the contract given in instructions numbers 18 and 19 was incorrect, and under no circumstances did the court have the right to submit to the jury the meaning of this contract. McQuillin on Instructions to Juries in Missouri, Civil Cases, sec. 60. (8) An instruction referring the jury to the pleadings to find the issues is erroneous, especially where part of the allegations are not supported by any evidence. Remmler v. Shenault, 15 Mo. App. 192; Grant v. Railroad, 25 Mo. App. 227. Instruction number 20 not only imposes upon the jury the duty of construing the contract, but also referred the jury to defendant's counterclaim to ascertain the construction. (9) It is the general rule that all terms in instructions and all phrases which the jury would not ordinarily understand must be defined, as, for instance, "negligence," "reasonable care," "due diligence," "probable cause," "malice," etc. Applying this to instructions numbers 18 and 19 it will be seen that both instructions required the return of the lamps "within a reasonable time" after February 5, 1910. Neither instruction defined the rule governing the ascertainment of a reasonable time. This was necessary, as the following cases will show: Schwab v. Union Line, 13 Mo. App. 159; Skeen v. Springfield Eng. & Thresher Co., 34 Mo. App. 485; Heating & Plumbing Co. v. Oviatt, 60 Mo. App. 565; Joseph v. Andrews Co., 72 Mo. App. 551; Sloop v. Railroad, 93 Mo. App. 605.

*Brownrigg & Mason* for respondent.

ALLEN, J.—This is an action to recover money paid by plaintiff to defendant for certain lamps, under and by virtue of a contract between the parties. Defendant denied liability for the return of the money so paid it, and interposed a counterclaim for the value of certain other lamps that it had shipped upon plaintiff's order. There was judgment for defendant, both on plaintiff's cause of action and on defendant's counterclaim, and plaintiff prosecutes this appeal.

On August 5, 1909, a contract was entered into between the parties, both of them being corporations, wherein defendant, Stave Electrical Company, is designated as the party of the first part, and the plaintiff, Handlan-Buck Manufacturing Company, as the party of the second part. The contract, omitting unessential verbiage, is as follows:

"Whereas, the party of the first part is the owner of United States rights in certain arc lamps known as 'Flaming' and 'Miniature' arc lamps:

"Now, in consideration of the execution of this contract, the performance of the agreements hereinafter recited and the receipt of one dollar in hand paid to the party of the first part by the party of the second part, receipt whereof is hereby acknowledged, the party of the first part hereby grants and gives unto the party of the second part *the exclusive right of the sale* of arc lamps hereinafter mentioned, throughout . . . [a designated territory] *for a period of six months from date of this contract with the privilege of the party of the second part to renew this contract for a further period of six months, provided that the sales in the first period of six months amount to one hundred and fifty lamps, and to again* renew this contract for a further period of six months provided the sales in the second period amount to two hundred lamps.

"It is further agreed between the parties hereto that the party of the first part shall sell and deliver

to the party of the second part, or to such customers which the party of the second part may determine, two types of 'Flaming' arc lamps, . . . . the former to sell *at the list price* of fifty-five dollars per lamp, the latter for the *list price* of sixty-five dollars per lamp. . . . . All these prices are subject *to a discount* of twenty per cent and ten per cent *to party of the second part* delivered f. o. b. St. Louis, Missouri.

"It is furthermore agreed that the parties of the second part shall be actively represented, and immediately establish *subagencies* throughout the territory controlled by them.

"It is further agreed that the party of the second part will upon execution of this contract *immediately order twelve lamps in all of the different types and sizes as per order given under even date, and that payment for said lamps shall be made within thirty days from date of shipment, and that all payments for future orders shall be made within thirty days.*

"It is further agreed that the party of the first part *will from time to time ship lamps on consignment for approval orders, as requested by the party of the second part, and to be shipped to them or to such customers as the party of the second part may designate,* but the number of such lamps *on consignment* shall not exceed forty.

"The party of the first part agrees to furnish free of charge to the party of the second part stationery, advertising matter, circulars, pamphlets, in order to facilitate sales, and further agrees to mention the party of the second part in all their general advertising and refer to them as *a local branch of the Stave Electrical Company.* . . .

"It is also further understood and agreed that *should the party of the first part at the expiration of first term of contract decide to discontinue same the party of the first part agrees to take back such lamps and parts as party of the second part may have on*

*hand, provided the party of the second part pays the freight both ways.*

"The party of the first part reserves to itself the right to consummate any deal with profits to the party of the second part. . . . In the event of the party of the second part making sales in territory other than their own, said second party hereby agrees to hand one-third of the gross profits to the organization controlling such territory, but in the event of such territory not being controlled by any agent, the party of the second part is privileged to make the sale as if such territory were part of this agreement.

"It is further agreed that the party of the second part shall not sell, assign or transfer this contract and its rights thereunder without the consent of the party of the first part, and that they shall be actively engaged in said arc lamp business, and that no business antagonistic to such arc lamp business shall at any time be conducted by the party of the second part, and that any violation of this paragraph will subject the entire contract to immediate abrogation."

We have italicized certain portions of the above instrument for the purpose of later directing attention thereto.

The petition avers the execution of the contract, a copy of which was attached thereto, alleges that plaintiff thereunder became the agent of defendant, and that for the purpose of such agency agreed to order and pay for, and did so order and pay for, lamps of the value of $507.26; that defendant by the contract agreed that, if at the expiration of six months said contract was not renewed, defendant would receive back such lamps and return to plaintiff the cost price thereof, provided plaintiff paid freight both ways; that the contract was not renewed at the expiration of six months; that plaintiff had performed all of the terms and conditions thereof, had tendered to defendant the lamps mentioned, and demanded the return

of its money and offered to pay the freight; but that defendant had refused to receive the lamps and return plaintiff the purchase price thereof; the plaintiff praying judgment in the sum of $507.26.

The defendant, by an amended answer, admitted that plaintiff "bought of the said defendant lamps of the value of $507.26" and paid defendant therefor. The answer further contains a general denial, and avers that plaintiff did not offer to return to defendant the lamps purchased by plaintiff, nor demand the return of its money until November 25, 1910, nearly ten months after the expiration of the first period of six months "during which said contract had continued;" and that by reason of plaintiff's said delay in the premises it had lost the right to return said lamps and recover its money, "if plaintiff ever had such right under said contract." And for a counterclaim defendant averred that, under and by virtue of the contract between the parties, "plaintiff agreed to become the agent of the defendant for the sale of certain electrical lamps and fixtures," and that defendant agreed thereby to deliver to plaintiff upon consignment a number of lamps, not to exceed forty, and that such lamps so furnished and not sold by plaintiff were to be subject to defendant's order; that defendant did furnish and deliver to plaintiff, upon consignment, certain lamps of the value of $1040.62, in accordance with an itemized statement set forth in the counterclaim; that said lamps not having been sold by plaintiff prior to November 30, 1910, defendant, on said day, ordered plaintiff to ship to it said lamps and attachments held by plaintiff on consignment, but that plaintiff, without just cause or excuse, refused to return the same to the defendant, or to ship them upon the latter's order, and continued to neglect and refuse so to do. And defendant averred that it had been damaged thereby in the sum of $1040.62, for which it prayed judgment.

The evidence discloses that pursuant to the contract plaintiff undertook to sell defendant's lamps in the territory mentioned in the contract.

In August, 1909, plaintiff requested the shipment "upon consignment" of twenty lamps to be used for exhibition purposes at a convention in Denver, Colo., to be held in the following October. These lamps were sent to Denver, but it appears that the proper electrical current could not be had for using them, and they were merely stored, and ultimately shipped back to St. Louis and stored in a warehouse.

Plaintiff did not at any time succeed in making any sales of defendant's goods. And at the expiration of the first period of six months nothing appears to have been done with respect to the subject-matter of the contract.

On March 26, 1910, plaintiff wrote defendant a letter, stated to be in reply to the latter's "various letters" regarding the agency. This letter referred in part to the lamps that were sent to Denver, and which were then in a storehouse at the latter place, and requested defendant to take the matter up with its Denver representative and have such lamps transferred to defendant's "Denver account;" or, if this was not satisfactory, then that plaintiff be permitted to have them shipped from Denver to any of defendant's eastern agents. The letter further explained that a salesman, who had previously been in charge of this portion of plaintiff's business, was no longer with it; and stated that, should defendant feel it to be its duty "to transfer the agency to some other concern," it would doubtless not be met with serious objection from plaintiff. The record contains no reply to this letter.

It seems that, in May, 1910, Theodore Stave, defendant's president, was in the city of St. Louis and conferred with A. H. Handlan, Jr., secretary of plain-

tiff company. The latter testified that defendant's president then agreed that the contract should be "set aside," and agreed to take all the lamps back, but asked that they be allowed to remain with plaintiff for the time being.

Defendant's president first testified that Handlan, at this meeting, requested him to take back the original twelve lamps, but that he refused to do so. Later, however, he contradicted this and testified that during this conversation nothing was said about returning the original twelve lamps, but only the "lamps that were consigned." He further testified that nothing was said at the time by either him or Handlan in regard to the continuance or discontinuance of the contract.

It appears that after the conversation between Stave and Handlan, in May, 1910, the latter engaged a man who had been sent by Stave, and who, for a time at least, made some effort to sell defendant's lamps, working, it is said, on commission; and that on June 9, 1910, a letter was sent by plaintiff to defendant asking for certain information which this salesman desired; and that on June 16, 1910, an order was sent for certain lamps, on consignment, but which do not appear to have ever been shipped.

On September 12, 1910, plaintiff wrote defendant asking that the latter give shipping instructions "for the arc lamps on hand." Again on October 13, 1910, plaintiff wrote defendant as follows:

"Referring to our recent correspondence, we beg to ask if you will not let us have disposition of the lamps now on hand."

And on October 25, 1910, plaintiff again wrote, saying:

"On September 10, we requested that you be kind enough to advise us as to the disposition of the lamps we have on hand," asking that the matter be given attention.

And again on November 3, 1910, plaintiff wrote defendant:

"We have written you three or four times to ask disposition of the lamps on hand, but up to the present time have not been favored with a reply," etc.

It appears that some time in November, 1910, Handlan, plaintiff's said secretary, was in the city of New York, and had a conference with defendant's president. Handlan testified that he insisted at that time that some disposition be made of the lamps which plaintiff had on hand, and that defendant's president promised to give shipping directions therefor within two or three days, saying that he had a prospective customer for them elsewhere. On cross-examination he stated that he had "in a measure" looked to the consigned goods as security for the money which had been paid for the original twelve lamps.

With respect to the conversation in New York, defendant's president testified that he asked Handlan to return the "consigned lamps," asking that the latter pay the freight and storage, but that Handlan declined to do so.

On November 25, 1910, after Handlan had returned to the city of St. Louis, he wrote defendant, on behalf of plaintiff, as follows:

"On my return home I find that there has been nothing done regarding disposition of the lamps we have on hand. Since then there have been shipments made to customers in our city and no record made for the lamps that we have in stock. We beg to say that we must have immediate advice regarding the disposition of these lamps, and expect you to advise us definitely and give us shipping instructions and a check covering the lamps we paid you for by return mail."

On November 30, 1910, defendant wrote plaintiff as follows:

"We have yours of November 25, and will be glad to immediately take back the lamps that you have on consignment, but we do not wish to take back those of your own stock for which you have already paid. Because we do not want to buy back our own material. . . . Therefore if you will kindly send us all lamps with the exception of those for which you have paid, we will be glad to take them back."

On December 2, 1910, plaintiff, replying to defendant's letter of November 30, wrote:

"Beg to advise if you will notice the conditions in the contract we have with you, you will find on the third page where the 'first party agrees to take back such lamps and parts as party of the second part may have on hand, provided the party of the second part pays freight both ways.' We desire to return these lamps under the clause in this contract," etc.

It appears that plaintiff never received a reply to this letter, and on December 8, 1910, it again wrote defendant as follows: "Let us have reply at once to our letter of the second instant." Receiving no reply to this, plaintiff on December 14, 1910, instituted this action.

I.  The rights and duties of the parties in the premises primarily, of course, spring from and are to be governed by the written contract into which they entered. The latter is, in some respects at least, a peculiar instrument. It is clear, however, that the intention of the parties is to be gathered from the entire instrument, and not from isolated portions thereof. All of its provisions are to be read together, and to be construed, if possible, so as to bring them into harmony.

In the first place, we may say that a consideration of the contract as a whole leads us to the conclusion that it is essentially one creating an agency, and that plaintiff thereby became, in a certain sense at least,

the agent of defendant. It is true that the clause of the contract referring to the original twelve lamps provides that plaintiff shall order the same, and payment therefor shall be made within thirty days, and that "all payments for future orders shall be made within thirty days." This clause, if standing alone, could mean nothing more than that these lamps were sold outright to the plaintiff. However, this provision of the contract is to be read and construed together with the remaining provisions thereof in order that the intent of the parties may be derived from the whole.

By the contract defendant granted to plaintiff "the excusive right of sale" of defendant's arc lamps in a certain territory, for a period of six months, with the privilege on the part of plaintiff to renew the same for a further period of six months, provided plaintiff sold during the first period as many as one hundred and fifty lamps. Plaintiff was required to sell the lamps according to defendant's list price thereof, plaintiff's profit to be derived to it through the discount allowed it on these prices. Plaintiff agreed to establish "subagencies," and defendant agreed to refer to plaintiff in all its advertising as "a local branch" of defendant. And later in the contract the word "agent" is used in referring to a person or "organization" controlling territory as did plaintiff under this contract.

In Wilcox & Gibbs Co. v. Ewing, 141 U. S. 636, 12 Sup. Ct. 97, 35 L. Ed. 882, the Supreme Court of the United States, speaking through Mr. Justice HAR-LAN, said of a somewhat similar contract:

"There was some discussion at the bar as to whether Ewing was, strictly, an agent of the company. We think he was. He was none the less an agent because of his appointment as 'exclusive vendor' of the defendant's machines within a particular territory, or because of the peculiar privileges granted to or the

peculiar restrictions imposed upon him. One clause of the contract prohibits him from soliciting trade, directly or indirectly, in the territory 'of other agents; another, that he will bind 'all subvendors or agents' to sustain the established retail prices of the company; and still another imposes restrictions upon the sale of his 'appointment or agency.' The agreement constituted him the sole agent of the company for the sale of its machines within a certain territory. It is true that the machines he undertook to sell were to be purchased by him from the company at a large discount. But he could not sell them by retail below the regular retail prices. This arrangement was the mode adopted to protect the company's interests, and to secure the plaintiff such compensation for his services as would induce him to devote his time, attention, and abilities to the company's interests. He was still a mere agent to sell such machines as might be delivered to him under the contract.''

''The contract may be one of agency, although the agent is to find his compensation in the discount allowed him by the principal from the usual price,'' or ''in the advance he may be able to secure from third persons above the principal's price to him.'' [31 Cyc. 1201.]

We are not here dealing with any intervening rights of third persons, and in this connection see Snelling v. Arbuckle Bros., 104 Ga. 362, 30 S. E. 863; Arbuckle v. Gates et al., 95 Va. 802, 30 S. E. 496; Arbuckle v. Kirkpatrick, 98 Tenn. 221, 39 S. W. 3, 36 L. R. A. 285, 60 Am. St. Rep. 854—cases all dealing with the same peculiar contract, and where in each instance it was held that the party selling the goods was not to be regarded as a mere agent of the other party to the contract, so far as concerned the rights of third persons.

II. We have made the foregoing observations with respect to what appears to us as being the general character of the contract because of the influence which this may have upon the determination of the questions presented by this record. And we say that from the contract as a whole it appears that it was intended to create a form of agency; and it appears that this agency may properly be called experimental in its character so far as concerns plaintiff. It is quite clear that the twelve lamps ordered and paid for by plaintiff under the terms of the contract, and which, as the contract provides, were in all the different styles and sizes of defendant's lamps, were intended to be used by plaintiff as samples, for exhibition, etc., for the purpose of endeavoring to sell defendant's goods; that plaintiff took the same for no other purpose, and could not well have had any other use for them.

Respondent's position, with respect to these lamps, is that the contract shows upon its face that they were purchased outright and paid for by plaintiff; that they thereby became the latter's property; and that the defendant was under no obligation to receive them back. It is quite true that the language of this portion of the contract, taken alone, tends to support respondent's theory; but, taking it in connection with all of the other terms and provisions of the contract, we think that respondent's position in this regard is not tenable. The provision in the contract that plaintiff order and pay for these lamps is not necessarily inconsistent with another provision thereof to the effect that defendant would, at a future date, take such lamps back and refund the amount paid thereon, if such be the proper construction to be placed upon the succeeding portion of the contract. By the latter it was agreed that, should defendant at the expiration of the first term of the contract "decide to discontinue same," it would take back such lamps and parts as plaintiff might have on hand.

With respect to the latter provision it is argued, for one thing, that it refers only to such lamps as plaintiff might have on consignment. But we cannot accede to this, for not only is the language used broad enough to include all lamps that plaintiff might "have on hand" at the time referred to, but from the contract, taken together with the facts and circumstances surrounding its execution, it appears that this clause must have been intended to refer, not merely to consigned goods, but to any which plaintiff had at any time ordered and had on hand. So far as concerns consigned goods, it appears that defendant merely bound itself to ship within a certain limit, goods upon "approval orders." It cannot well be supposed that it was contemplated that much, if any, of such consigned goods would be on hand in plaintiff's custody at the expiration of the first term of the contract. It was doubtless contemplated and hoped that plaintiff would be able to dispose of some considerable quantity of defendant's goods, and that orders would be placed with the latter from time to time and shipments to plaintiff made thereon. And it was doubtless contemplated that at the end of the first period of six months some of such goods, whether it be a portion of the original, or of subsequent, orders, would be on hand and in plaintiff's custody.

Considering all of the provisions of the contract, and the character of the agency thereby created, we think that this clause thereof relative to defendant's taking back its goods should be held to extend to any lamps or parts which plaintiff might have on hand; and that it requires defendant to take them back, and return the price paid therefor (for such is evidently the meaning of this provision), provided that such conditions were afterwards present as to make this clause operative at all.

III. The clause of the contract last above referred to purports to require defendants to take back the lamps which plaintiff might have on hand, should defendant "at the expiration of first term of contract decide to discontinue same." Respondent takes the position that the agreement did not obligate it to take back the lamps, in the event, merely, that the contract was not renewed, but only in case such nonrenewal was caused by a "decision" on the part of respondent to "discontinue" the contract. The trial court took respondent's view of this question, and instructed the jury accordingly; and further told the jury that it was necessary for plaintiff to prove "that the defendant did some affirmative act or made some statement indicating a decision on the part of defendant to discontinue the contract at the expiration of six months from its date."

By the terms of the instrument the contract period, in the absence of a renewal, was six months. That period elapsed under circumstances giving plaintiff no option to renew. Undoubtedly the contract then lost its binding effect, unless continued in force by the mutual agreement or consent of the parties. It cannot be contended that, after that time (absent any further agreement express or implied), the defendant remained obligated to longer protect plaintiff in an exclusive or other right to sell its goods, in the designated territory, or to allow plaintiff the contract discount from its prices; or that plaintiff, on the other hand, was bound to be "actively engaged in the arc lamp business," or to refrain from conducting any business "antagonistic to such arc lamp business." In this connection, see Bruckman v. Dry Goods Co., 91 Mo. App. 454.

And we think that the learned trial judge erred in holding that it was incumbent upon plaintiff to show some act or statement on the part of defendant indicating a decision on its part to discontinue the con-

tract. Quite to the contrary, we think that no affirmative act whatsoever was necessary on the part of any one to "discontinue" the contract, but that the latter, by its express terms, became inoperative when the first period of six months had elapsed, unless it appear either that the parties expressly agreed to continue it in force, or that from their acts and conduct in the premises their mutual consent thereto may be fairly and reasonably implied; and further that, if the contract did so terminate, defendant became liable to take back the goods in question and return to plaintiff the money paid thereon.

We are not disposed to place such a construction upon the use of the words "decide" in this clause of the contract as would permit defendant to play fast and loose with regard to its obligation to take back the goods. We do not assume that this was thereby intended. And a reasonable construction of this clause of the contract, and one consonant with the apparent intention of the parties, to be gleaned from the instrument as a whole, is, we think, that at the end of the first period of six months defendant's liability attached to take back the goods, unless the contract was renewed or otherwise continued in force. If the contract was suffered to expire according to its terms, then defendant must be regarded as having decided to permit it to do so and to "discontinue" it. Defendant should not be heard to say that it did not decide to permit that to occur which it had contracted should happen. As to this defendant had expressed its decision in the beginning, in the instrument itself, when it thereby granted plaintiff certain rights for a distinct and definite period only, subject merely to a conditional option to plaintiff to renew for further like periods. We are of the opinion, therefore, that if the contract, as such, terminated, and ceased to be a binding obligation, at the end of the first period of

six months, defendant's liability accrued with respect to taking back the goods.

The defense of delay on the part of plaintiff in offering to return the goods in question in unavailing; for not only does it appear that defendant acquiesced therein and that plaintiff made numerous offers to have the matter disposed of, but it further clearly appears that a tender would have been unavailing; for, according to defendant's own evidence, it repeatedly refused to take back these goods, not upon the ground of delay, but because it claimed that the contract did not require it to do so.

We think that the only available defense to plaintiff's cause of action, which the evidence has here any tendency to establish, is that the contract was continued in full force and effect after the termination of the first period of six months after its execution, and that plaintiff thereby waived its right to require defendant to take back the goods.

The contract granted an exclusive right for a limited period only, and contemplated renewals for further limited periods. It is certain that there was no renewal thereof in the sense in which that term was employed in the instrument itself; and the record fails to disclose any evidence whatsoever of an express agreement made to continue the contract in force. No reference to this matter appears in any of the correspondence passing between the parties, and defendant's president testified that no mention was made of it in the interview in St. Louis in May, 1910.

But while there was no evidence of an express agreement to renew or continue the contract, there was perhaps evidence from which the jury might infer that the parties, by mutual consent, had permitted it to continue or remain in force for an indefinite time after the first period of six months, and that therefore defendant's obligation to take back the goods did not attach but had been waived by plaintiff. Some of the

acts of plaintiff after the end of the first period of six months may perhaps appear to recognize the continued existence of the contract, such as later renewing its efforts, to some extent, to sell defendant's goods, and referring to "the agency" in its correspondence; although they are equally compatible with a bare license from defendant. The discontinuance of the contract, as such, would not necessarily mean the severance of all business relations between the parties, and it may be that they sustained some, though quite different, relations toward each other after February 5, 1910. And there is evidence tending to show that defendant treated the contract, as such, as being at an end after the first six months; even though it may have desired plaintiff to continue to make efforts to sell some of its goods. After the expiration of the first six months, it appears that the whole matter lay dormant for some months. And it seems that defendant did not fill the only order sent it by plaintiff thereafter, to-wit, the "consignment" order of June 16, 1910. And in plaintiff's letter of November 25 it stated to defendant that the latter had been shipping goods to others in the territory in question; and in reply to such letter defendant appears to have made no denial thereof.

Upon the whole, however, we are led to the conclusion that the evidence cannot be said to conclusively show that the contract was not continued in force, after the six months in question, by the mutual consent of the parties; and that therefore this question was one of fact for the jury under appropriate instructions. [See Bruckman v. Dry Goods Co., supra.]

In other words, our conclusion is that, under the contract and the facts and circumstances appearing in evidence, plaintiff was entitled to recover on its cause of action, unless it be found that the parties by mutual consent continued the contract, as such, in full force and effect after the expiration of the period of

six months for which it was expressly limited, whereby the plaintiff waived its right to tender back the lamps and demand the return of the moneys paid by it on account thereof; and that whether the contract was so fully continued in force and effect, whereby such waiver would attach, was a question, and the only question, for the jury, under instructions leaving it to the jury to say what inference should be drawn from the acts and conduct of the parties in the premises—whether the contract, as such, was fully continued in force, or whether, on the other hand, after the expiration of the first six months, the parties regarded the contract as not binding upon them, but that there was a mere understanding that plaintiff would continue to offer defendant's goods for sale, or a bare license so to do, until defendant should establish another agency for the territory in question, or make other disposition of the subject-matter of the contract.

IV. Defendant's counterclaim, for the value of the lamps that were originally shipped for exhibition purposes at Denver, is predicated upon its letter of November 30, written in reply to plaintiff's letter of November 25. From the record it appears that plaintiff had previously written a number of letters concerning the disposition of the lamps on hand, to which defendant had not made reply; and, upon receiving defendant's letter of November 30, plaintiff did not at once ship the "consigned lamps," but wrote the letter of December 2d, calling defendant's attention to the terms of the contract, and saying that it wished to return the lamps which it had "in stock," under the terms of the contract as plaintiff construed the latter.

It is urged by learned counsel for respondent that the latter's counterclaim does not allege a conversion, but that "it is in the nature of a claim for damages for breach of the agreement to return the

consigned lamps.'' But the theory pursued through-
out by respondent below was that its counterclaim was
one for conversion of the lamps consigned to appellant.
The counterclaim seeks a recovery for the value of the
consigned goods, alleging a demand therefor and a
refusal on the part of plaintiff to comply with such de-
mand, thus appearing to proceed upon the theory that
plaintiff thereby converted the same to its own use.
At any rate, it was upon this theory that the action
was submitted below, by defendant's instructions. And
it will be so considered here.

But we think that plaintiff cannot be convicted
of having converted the consigned lamps to its own
use. The alleged conversion is predicated upon the
theory of a demand upon plaintiff by defendant's let-
ter above mentioned, and a refusal to comply there-
with. It is not, therefore, essential to consider whether
there was any evidence of a prior conversion thereof;
but we perhaps ought to say that the evidence does
not show such a prior conversion. It is true that de-
fendant's president testified that he asked plaintiff's
secretary, at the time of their conversation in New
York, in November, 1910, to return the consigned
lamps; but such request as he claims that he then made
(if indeed it can be said to have been a demand at
all) was a demand with a condition thereto which it
appears that defendant had no right to impose, to-
wit, the payment of all storage charges which had
accrued thereon. Both parties treated these lamps as
consigned goods; and as early as March 26, 1910,
plaintiff, by its letter of that date, requested that de-
fendant make some disposition of them, i. e., that they
be turned over to defendant at Denver, or that ship-
ping instructions be given plaintiff therefor. Defend-
ant did not do this, and it appears that plaintiff later
shipped the goods to St. Louis and stored them there
in a storehouse. Defendant therefore became liable
for storage thereon after it had a reasonable oppor-

tunity to act upon plaintiff's said letter, and could not thereafter require plaintiff to defray the same.

Such request and refusal, if any, was therefore no evidence of a conversion. And furthermore, the subsequent correspondence passing between the parties negatives the idea that there was any conversion of defendant's goods prior to the time mentioned in the counterclaim.

And turning to the demand alleged to have been made upon plaintiff on November 30, 1910, we find it insufficient to support an action for conversion. Where one is entitled to the immediate possession of personal property, a demand therefor and a refusal to surrender possession thereof constitute prima-facie evidence of a conversion. [See Huxley v. Hartzell, 44 Mo. 370; Newman v. Trust Co., 189 Mo. loc. cit. 445, 88 S. W. 6; 38 Cyc. 2031; Felcher v. McMillan, 103 Mich. 494, 61 N. W. 791.] But the demand must be peremptory and clothed in absolute unequivocal terms. [See 38 Cyc. 2037, 2038; Cumberland Telephone Co. v. Taylor, 44 Ind. App. 27, 88 N. E. 631; Monnot v. Ibert, 33 Barb. (N. Y.) 24.; Sutton v. Ry. Co., 99 Minn. 376, 109 N. W. 815.]

There was here no such demand. Defendant's letter of November 30th, did not purport to make such a demand upon plaintiff to return the consigned lamps. This letter was written after repeated attempts of plaintiff to get some reply from the defendant with respect to the disposition of the lamps on hand. And by such letter defendant merely expressed a willingness to take back the "consigned" goods. The letter stated that defendant would be "glad to immediately take back" all lamps except those for which plaintiff had paid, and that if plaintiff would kindly ship them defendant would be "glad to take them back." And in reply to this letter plaintiff, by its letter of December 2d, merely pointed to the provisions of the

contract, giving it, as it thought, the right to return all lamps.

This was not such a demand and refusal as to constitute evidence of a conversion. Considering that the correspondence between the parties related to their respective rights and obligations upon severing their business relations, plaintiff's former efforts to have defendant give shipping directions for these very goods, and its several letters in September, October, and November of that year, which met with no response, plaintiff cannot be made liable as for conversion merely by defendant finally expressing its willingness to take back these goods, and plaintiff replying thereto to the effect that defendant was bound to take back all the goods which plaintiff had on hand, as the latter interpreted the contract. And that defendant was not, by its letter in question, making a demand for the immediate possession of these goods, is further shown by the fact that it made no reply whatsoever to plaintiff's letter last above mentioned; nor, as it appears to a subsequent one written some days later.

Respondent urges that the counterclaim, "being on contract for the recovery of money," is controlled by the provisions of section 2283, Revised Statutes 1909, and that want of demand is unavailable to appellant because not specially pleaded by it.

But, as said above, the action is to be here treated as one for conversion. And the provisions of the statute above referred to do not apply in actions of trover and conversion. [See Nanson v. Jacob, 93 Mo. 331, 6 S. W. 246, 3 Am. St. Rep. 531.] The statute provides that it shall not be available to a party as an objection that no demand for the subject-matter of a suit was made prior to its institution, unless it is expressly set up by way of defense in the answer or replication, etc. But we think it quite apparent that the statute was not intended to apply to an action of

conversion, where the possession of the defendant in the action was originally rightful, where no actual conversion is in terms alleged, and where the action must rest solely upon a demand made for the property and a refusal to comply with such demand, as evidence of conversion. [See Nanson v. Jacob, supra, 93 Mo. loc. cit. 342, 6 S. W. 246, 3 Am. St. Rep. 531.]

In this connection, respondent places much reliance upon Engle v. Dressel, 26 Mo. App. 39, and Antonelli v. Basile, 93 Mo. App. 138. The latter was an action for money had and received, i. e., the count with which we are here concerned. It was held that the allegation that defendant had converted the money to his own use was mere surplusage; and that the action for money had and received could be maintained irrespective of whether or not it was maintainable as an action of trover and conversion. And what is said in Engle v. Dressel, supra, to the effect that want of demand could not be shown because not pleaded, was based upon Battel v. Crawford, 59 Mo. 215, cited in support thereof. But the last-mentioned case, as to this point, is expressly disapproved in Nanson v. Jacob, supra, 93 Mo. 343, 6 S. W. 246, 3 Am. St. Rep. 531, where the question is fully discussed by SHERWOOD, J., and which overrules the prior decision in Raithel v. Dezetter, 43 Mo. 145.

It is also urged that the evidence shows that a demand would have been unavailing, as in Engle v. Drsssel, supra, and Swinney v. Gouty, 83 Mo. App. 549. But we think that this has no application here. In the Engle case the bailee had absconded with the thing bailed, and his whereabouts were unknown; the action proceeding by attachment. In the Swinney case the corn alleged to have been converted had been consumed by the defendant's stock prior to the institution of the suit. In neither of these cases did the action, as here, depend upon proof of a demand and refusal,

as evidence of the conversion. Such demand and re-fusal were here alleged, but were not established by the proof.

Other authorities might be referred to in this connection, but we think it clear that defendant was not entitled to recover on its counterclaim, and that the court below should have directed a verdict for plaintiff thereon.

V. It is unnecessary to discuss separately the various assignments of error pertaining to the instruc-tions, for they are disposed of by what has been said above.

The judgment should be reversed, and the cause remanded, in order that plaintiff's cause of action may be retried in accordance with the views expressed in this opinion; and with directions to the circuit court that, upon such trial being had, it enter judgment for plaintiff on defendant's counterclaim. It is so or-dered. *Reynolds, P. J.,* and *Nortoni, J.,* concur.