440 So.2d 666 (1983)
GEORGIA-PACIFIC CORPORATION, a Georgia Corporation, Appellant,
v.
WALTER E. HELLER & COMPANY SOUTHEAST, INC., a Louisiana Corporation, Appellee.
No. AS-61.
District Court of Appeal of Florida, First District.
November 18, 1983.
*667 David W. Carstetter, of Kent, Watts, Durden, Kent, Nichols & Mickler, Jacksonville, for appellant.
Douglas H. Morford, of Ulmer, Murchison, Ashby, Taylor & Corrigan, Jacksonville, for appellee.
PER CURIAM.
Georgia Pacific Corporation appeals a final judgment in favor of Walter E. Heller & Company Southeast, Inc. permitting Heller recovery of the value of certain property converted by Georgia Pacific in the amount of $11,321.00 plus interest. The issue for our review is whether the total business relation involving these parties and a bankrupt entity was a transaction encompassed within the Florida Uniform Commercial Code, Section 672.326, Florida Statutes. No published Florida cases deal directly with the specific question before us and therefore we resort to authorities from other jurisdictions for assistance. The trial judge in this case, Judge Thomas D. Oakley, considered those authorities and favored the parties and this court with a well-reasoned and erudite judgment which we adopt as our own. That order provides as follows:
THIS CAUSE came on for trial before the Court without a jury.
The facts are not in dispute. In December of 1976, Georgia Pacific Corporation ("Defendant") entered into a contract with Bill Amos Brokerage Co., Inc. ("Bill Amos"), whereby Defendant agreed to consign stock to Bill Amos. The contract provided that the risk of loss for merchandise shipped to Bill Amos would pass to Bill Amos upon delivery of the merchandise by a carrier.
The contract contained numerous references to the term "consigned merchandise" and provided that Bill Amos would assist the Defendant in any reasonable manner to protect the interest of Defendant "in this consignment transaction including, but not limited to, execution (of) financing statement, posting of signs under a sign law, and otherwise." The Defendant took no action to perfect its interest in goods shipped to Bill Amos by the filing of a UCC-1 financing statement.
At the time Bill Amos entered into the agreement with the Defendant, Bill Amos operated a warehouse facility located in Jacksonville, Florida, at which Bill Amos was engaged in business as a wholesale food and grocery distributor, broker and merchant, dealing in food products and grocery items, including paper products.
Subsequent to the execution of the agreement, Defendant consigned merchandise to *668 Bill Amos consisting of paper products such as paper towels, tissue and the like.
The Defendant shipped paper products to Bill Amos primarily to facilitate the sale of such products to military commissaries located in the State of Florida. When Bill Amos would ship consigned merchandise to a commissary, it would file a report with Defendant indicating that the delivery had been accomplished. The Defendant then invoiced the commissaries and received payments directly from the commissaries for the paper products delivered. Bill Amos received a commission from the Defendant representing 8% of the total sale price.
On August 2, 1977, Plaintiff's predecessor in interest, First National Heller-Factors, entered into an Inventory Loan Security Agreement and an Accounts Financing Security Agreement with Bill Amos. First National Heller-Factors obtained and filed UCC-1 financing statements covering all "accounts, contract rights, chattel paper and general intangibles, all inventory ..." The financing statements also covered the proceeds of collateral.
On September 15, 1978, First National Heller-Factors assigned to Plaintiff, Walter E. Heller & Company Southeast, Inc. ("Plaintiff"), all of its right, title and interest in the Inventory Loan Security Agreement, the Accounts Financing Security Agreement, and the financing statements in question.
On September 15, 1978, and at all material times thereafter, Bill Amos was indebted to Plaintiff in an amount in excess of $500,000.
On January 22, 1979, Bill Amos filed a voluntary petition in the United States Bankruptcy Court, For the Middle District of Florida, pursuant to Chapter XI of the Bankruptcy Act.
Shortly after the filing of the bankruptcy petition, the Defendant entered upon the premises of Bill Amos to reclaim the merchandise that had been consigned by Defendant to Bill Amos. The Defendant expected to find in excess of 1,400 cases of paper products. In fact, the Defendant located and removed from the Bill Amos facility consigned inventory consisting of 390 cases of goods, valued at $11,321.00.
Plaintiff contends that the removal of such goods by the Defendant was in derogation of the Plaintiff's superior rights to possession as a secured creditor and as such constituted conversion. Plaintiff argues that either the transaction constituted a consignment intended as security within the meaning of Section 671.201(37), Florida Statutes, or was a sale or return transaction governed by the provisions of Section 672.326, Florida Statutes, which in pertinent part provides that:
"(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as `on consignment' or `on memorandum'. However this subsection is not applicable if the person making delivery:
"(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or
"(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or
"(c) complies with the filing provisions of the chapter on secured transactions (Chapter 679)."
Defendant contends that the transaction was not a consignment intended as security. Defendant further contends that the paper products consigned to Bill Amos were not delivered "for sale" and that as such the provisions of Section 672.326(3), Florida Statutes, are inapplicable. Defendant relies primarily upon the case of Walter E. Heller & Company Southeast, Inc. v. Riviana Foods, Inc., 648 F.2d 1059 (5th Cir.1981).
*669 The Riviana case, like the instant case, arose out of the Bill Amos bankruptcy proceeding. As in the instant case, the contractual agreement between Riviana and Bill Amos made no express provision for the sale of Riviana's goods by Bill Amos. Nonetheless, Riviana conceded, as the evidence indicates herein, that Bill Amos operated a place of business under its own name at which it dealt in food and grocery products. Riviana also admitted, as is admitted by the Defendant herein, that it took no steps whatsoever to evidence its retained ownership interest in the goods shipped by Riviana to Bill Amos and held at the Bill Amos facility.
In the Riviana Foods case, the United States District Court, For the Middle District of Florida, granted Riviana's motion for summary judgment in an unpublished opinion. The Court determined that the transaction between Riviana and Bill Amos was not a deemed sale or return under Section 672.326(3), Florida Statutes. The United States Court of Appeals for the Fifth Circuit subsequently affirmed this opinion per curiam at 648 F.2d 1059.
A principal issue in the Riviana case, as in the instant case, was whether the goods had been delivered by Riviana to Bill Amos "for sale", since no express authority had been conferred upon Bill Amos to sell.
The Riviana case has been criticized as an incorrect interpretation of Section 2-326(3) of the Uniform Commercial Code. See Brown, U.C.C. Section 2-326(3): Creditor Protection in the Deemed Sale or Return Transaction, 32 Case Western Reserve Law Review 904. This Court does not agree with the decision reached in the Riviana case.
The legislative history with respect to Section 672.326(3), Florida Statutes, indicates that a consignee's creditors are to be protected from secret reservations in ostensible ownership situations. Official Comment 2, Section 672.326, Florida Statutes.
Section 672.326(3), Florida Statutes, was enacted for the purpose of protecting the creditors of a merchant who is the apparent owner of goods located at the place of business of the merchant.
In the case of Manufacturer's Acceptance Corporation v. Penning's Sales, Inc. [5 Wash. App. 501] 487 P.2d 1053 (1971), a paint manufacturer shipped an inventory of paint to itself in care of a paint store under an agreement with the store owner by which the paint manufacturer reserved title to the paint which the store owner was to hold in a storage area at the rear of the paint store, subject to the manufacturer's order to ship the paint to one of the paint manufacturer's dealers in the area. For this service, the paint store was paid 6% of the amount of each order shipped or delivered to a dealer of the paint manufacturer. The paint store conducted a retail paint sales business in the front portion of the store.
The paint manufacturer contended that the agreement was simply a warehousing agreement, and that as such the goods could not be subjected to the claims of Manufacturer's Acceptance Corp., which held a perfected security interest in the inventory of the paint store. The court held that the transaction was a sale or return within the meaning of Section 2-236 [sic] of the Uniform Commercial Code, since the paint store was dealing in goods of the kind involved in the inventory stored on the premises. The Court went on to point out that the paint manufacturer had not rendered the sale or return provision inapplicable by establishing one of the three exceptions contained in Section 2-326(3) of the Uniform Commercial Code.
The decision in Manufacturer's Acceptance Corp. v. Penning's Sales, Inc., supra, demonstrates that the Uniform Commercial Code disregards the intended character of the transactions between the parties and treats a transaction as a sale or return when goods are delivered to a person who maintains a place of business at which he deals in goods of the kind involved under any name other than that of the person making delivery. See 1 Anderson, Uniform Commercial Code, § 2-326:6.
*670 In the case of General Electric Co. v. Pettingell Supply Co. [347 Mass. 631] 199 N.E.2d 326 (1964), General Electric delivered electrical fixtures to Pettingell Supply Company. Pursuant to the agreement between the parties, Pettingell could sell to certain customers who purchased for their own use and was also authorized to make deliveries under contracts for sale entered into between General Electric and certain distributors of General Electric.
The Court held that Section 2-236(3) [sic] of the Uniform Commercial Code was applicable, and that as such the creditors of Pettingell had a superior right to possession of the goods.
Although the holdings in Pettingell and Penning's Sales did not specifically address the issue of whether Section 2-326(3) of the Code would apply if the person in possession did not have the authority to personally sell the goods delivered, this issue was discussed at some length in a law review article entitled Commercial Transactions: UCC Section 2-326 and Creditors' Rights to Consigned Goods, 65 Columbia Law Review 547, at 549. In referring to the Pettingell case, the article stated that:
"The instant case is significant not because the factual situation seriously tested the meaning of Section 2-326(3), but because it underscored the ambiguities of the provision. For example, if Pettingell's sole authority had been to distribute the lamps to subagents, a difficult problem would have arisen. By its terms, the section is applicable only if `goods are delivered to a person for sale'. But for sale by whom? The court's holding in this case covers the situation in which the person receiving the goods is authorized to sell them himself. The decision, however, does not exclude a broader application of Section 2-326(3) to transactions in which goods are delivered for ultimate sale. It is reasonable to assume that a general creditor has protection under the provision whether his debtor had authority to sell all, part or none of the goods. Such an interpretation, consistent with the intent of the framers of the UCC, would protect creditors of unstable consignees who act only as delivery and collection agents. It would comport with UCC Section 2-403(2) which provides that a merchant in possession of goods of the kind in which he deals can, in the ordinary course of business, transfer ownership to a buyer. That the protection under Section 2-326(3) is equivalent to that under Section 2-403(2) is to some degree supported by the instant case. Although GE's contract with Pettingell conferred authority to sell the goods, in fact only twenty-six percent of the goods were distributed in this fashion. Even if one percent had been sold, the decision implies the same result. Carrying this theory to its logical conclusion, one could expect that whether Pettingell sold any goods would be immaterial."
The issue of lack of express authority to sell was squarely faced in the case of In Re Novak, 7 UCC Rptr. 196 (Md.Cir.Ct. 1969). In the Novak case, a merchant who dealt in business machines entered into a sales agency agreement with a manufacturer, pursuant to which all proposed sales contracts were forwarded to the manufacturer for credit check and approval. All billings for sales to customers were from the manufacturer's offices, and all payments for machines were made directly to the manufacturer. The manufacturer paid the merchant a monthly commission on sales. The Court, in commenting on the fact that the merchant was not shown to have actual authority to make sales, stated that:
"Although certain transactions may not be sales under Section 2-106(1) [of the Code] they are `deemed to be on sale or return with respect to claims of creditors of the person conducting the business' ... [T]o answer the issues raised by respondent that Debtor was not a buyer, ... this Court does not feel that it is improper to give broader application to Section (3) [2-326(3)] to include transactions in which goods are delivered at least in great part for ultimate sale. It is reasonable to assume that a general creditor has protection under the provisions whether his debtor had authority to sell *671 all, part or none of the goods. Such an interpretation, consistent with the intent of the framers of the Uniform Commercial Code, would protect creditors of unstable consignees who act as delivery and collection agents. It would comport with the Uniform Commercial Code, Section 2-403(2), which provides that a merchant in possession of goods of the kind in which he deals can, in the ordinary course of business, transfer ownership to a buyer." [Id. at pp. 201-202] [Emphasis supplied].
The agreement between Defendant and Bill Amos refers to consigned merchandise. Although Defendant has argued that the transactions in question were only storage and warehousing agreements, the Court, in In Re Novak, supra, after finding that the correspondence between the parties referred to the goods as "consigned stock" and "consigned inventory", held that use of the term "consigned" would be deemed to have the meaning associated with a general commercial transaction. The Court stated:
"The term `consignment' used in a commercial sense, ordinarily implies an agent, and denotes that property is committed to the consignee for care or sale." [Id. at p. 202] [Emphasis supplied].
Just as the existence of an undisclosed interest in goods does not prevent passage of title pursuant to Section 672.403(2), Florida Statutes, neither should a hidden interest prevent the enforcement of a security interest in goods delivered "for sale", whether the sale was to be made by the supplier or by the person to whom the goods were consigned.
In the case of Vonins, Inc. v. Raff [101 N.J. Super. 172] 243 A.2d 836 (N.J.App. 1968), an installer of plumbing and heating apparatus assigned his installation contracts to Vonins, pursuant to an agreement whereby Vonins agreed to engage Crest as its subcontractor for the assigned contracts and for any other installation contracts obtained by Vonins. Vonins furnished Crest with supplies and materials needed to complete the contracts, and Crest was to receive 40% of the total contract price for its labor services. Raff, an assignee for the benefit of creditors of Crest, claimed a superior interest to that of Vonins in the materials and supplies found at Crest's warehouse.
Vonins claimed that it merely stored and warehoused the goods at Crest's place of business, and that Section 2-326(3) of the Code was not applicable because Crest did not engage in selling the goods delivered by Vonins. In ruling that Section 2-326(3) of the Code was applicable and that Vonin's interest was subordinate to the interest of Raff, the Court stated:
"Further we do not deem it to be a prerequisite to Code application that Crest have been engaged at its premises in over-the-counter retail selling of plumbing equipment. Before the 1963 agreement, Crest installed this equipment, purchased from Elite, for various builders and developers. Thereafter, it continued to do the same with the equipment it obtained from Vonins. At all times in which Crest was engaged in operations, it performed the same method of distribution of equipment from manufacturer to ultimate user. Clearly, Crest maintained a place of business at which it dealt `in goods of the kind involved.' Even though an overall price would be charged for the installation of the equipment, it cannot be denied that the price of the equipment installed was a distinct component of that consideration. Thus, plaintiff delivered goods to Crest `for sale' to others. That resale need not have been consummated at Crest's premises for the statute to apply."
In both the Novak and Vonins cases, goods were delivered to an agent or bailee who was not permitted to sell the goods. Although it was claimed that Section 2-326(3) of the Code was not applicable because the goods were only stored and warehoused, both Courts ruled that Section 2-326 of the Code governed the transactions.
Just as in Vonins, Bill Amos was providing a component part of the total sales transaction, for which it was paid a percentage of the overall consideration. *672 The consignment of paper goods by Defendant to Bill Amos was to facilitate sales transactions and was thus "for sale" within the meaning of Section 672.326(3), Florida Statutes.
In the case of Bischoff v. Thomasson, 400 So.2d 359 (Ala. 1981), the Alabama Supreme Court held that the test to be applied in consignment cases:
"... is simply one of looking at the outwardly visible aspects of the transaction outlined in [Section 2-326(3)], viz:
(1) delivery of possession to the consignee,
(2) engaging in the business of selling such types of items by the consignee, and
(3) failure of the consignor to give public notice of his retained interest in the goods."
Id. at 367
In the instant case, the Defendant delivered possession to a consignee, Bill Amos, who was engaged in the business of selling goods of the type consigned by Defendant, and the Defendant failed to give public notice of any retained interest in the goods.
It should further be noted that although Bill Amos had no express authority to sell or otherwise dispose of merchandise consigned to it by the Defendant, the Defendant found that in excess of 1,000 cases of merchandise were missing when it attempted to retrieve its consigned goods. Although there is no direct evidence as to what has become of the goods, it is clear that as a dealer of goods in the kind involved Bill Amos could have passed good title to the goods pursuant to the provisions of Section 672.403, Florida Statutes.
Furthermore, it is obvious from the provisions of the contract between the Defendant and Bill Amos, a contract prepared by Defendant, that the Defendant was aware that some action was required to protect its interest in the consigned merchandise. Certainly, the Defendant was in the best position to protect itself. It could have done so by storing its products with a party who did not deal in food and grocery items. It could have done so by complying with the Article 9 filing requirements. The Defendant failed to protect its own interests and, as such, had an unperfected interest in the consigned goods, subordinate to the perfected security interest of Plaintiff.
The removal of goods by the Defendant was in derogation of Plaintiff's superior rights to possession of the inventory as a secured creditor and as such, constituted conversion. See 12 Fla.Jur.2d, Conversion and Replevin, Sections 6 and 17. See also Fletcher v. Dees, 101 Fla. 402; 134 So. 234 (1931). As such, Plaintiff is entitled to recover the reasonable market value of the property converted, together with interest thereon. 12 Fla.Jur.2d., Conversion and Replevin, Section 20.
In the instant case, the value of the goods removed by Defendant from the warehouse of Bill Amos was $11,321.00. Plaintiff is entitled to a final judgment in that sum, together with interest at the rate of 6% per annum from January 22, 1979 through June 30, 1982, and at the rate of 12% per annum from July 1, 1982, through the date hereof. Based on the foregoing, it is
ORDERED AND ADJUDGED that Plaintiff, WALTER E. HELLER & COMPANY SOUTHEAST, INC., do have and recover of and from the Defendant, GEORGIA PACIFIC CORPORATION, the sum of $11,321.00, together with interest thereon in the amount of $3,264.17, and costs of this action in the amount of $41.00, for a total sum of $14,626.17, for which let execution issue.
In adopting the trial court's opinion we, as did the trial judge, decline to follow the decision of the Fifth Circuit Court of Appeals in Riviana and rely instead on the better reasoned view of the authorities cited herein.
AFFIRMED.
MILLS, THOMPSON and WIGGINTON, JJ., concur.