**In re PEARSON INDUSTRIES, INC., Debtor.**

**Richard E. BARBER, Chapter 7 Trustee for Pearson Industries, Inc., Plaintiff,**

v.

**McCORD AUTO SUPPLY, INC., Defendant.**

**In re INDUSTRIAL & MUNICIPAL ENGINEERING, INC., Debtor.**

**Richard E. BARBER, Chapter 7 Trustee for Industrial & Municipal Engineering, Inc., Plaintiff,**

v.

**McCORD AUTO SUPPLY, INC., Defendant.**

**Bankruptcy Nos. 89–81684, 89–81834. Adv. Nos. 90–8116, 90–8109.**

United States Bankruptcy Court, C.D. Illinois.

Dec. 8, 1992.

Barry M. Barash, Barash, Stoerzbach & Henson, Galesburg, IL, for plaintiff.

Thomas L. Perkins, Kavanagh, Scully, Sudow, White & Frederick, P.C., Peoria, IL, for defendant.

Richard E. Barber, Galesburg, IL, Chapter 7 Trustee.

## OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

Pearson Industries, Inc. (PEARSON), located in Galva, Illinois, primarily manufactured and sold vacuum systems for handling animal waste. Industrial and Municipal Engineering, Inc. (IME), also located in Galva, Illinois, primarily manufactured and sold animal, industrial and commercial waste application equipment and fertilizer application equipment. (Their products are jointly referred to as "EQUIPMENT".) PEARSON and IME were related through common ownership. McCord Auto Supply, Inc. (McCORD) sells tires and rims (TIRES) at wholesale and retail. PEARSON and IME started manufacturing the above described EQUIPMENT in approximately 1984, and began buying TIRES from McCORD in the fall of 1987. The TIRES supplied by McCORD were incorporated by PEARSON and IME into the EQUIPMENT they manufactured.

Between the time that McCORD first began to supply PEARSON and IME with TIRES until approximately February 1, 1988, there were no formal written agreements between the parties. At first, McCORD shipped TIRES to PEARSON and IME from warehouses it operated in Monticello and Fowler, Indiana, and Nevada, Iowa, and sold the TIRES on a C.O.D. or cash basis. In late 1987 or early 1988, McCORD agreed to place an inventory of TIRES in a warehouse facility owned by PEARSON known as the "Impact Building". Initially, the Impact Building was occupied pursuant to an oral lease. Subsequently in July of 1989 PEARSON and McCORD entered into a written lease. The written lease provided that McCORD would pay rent of $300.00 per month beginning August 1, 1989. McCORD never paid any cash rent to either PEARSON or IME.

On February 1, 1988, a document entitled "Consignment Agreement" (AGREEMENT) was entered into between McCORD, PEARSON, and IME. Paragraph 1 provides that McCORD will supply PEARSON and IME with TIRES at the prices shown on Exhibit "A" to the AGREEMENT. Paragraph 2 provides that the TIRES shall be stored in a secured warehouse on or near PEARSON and IME's property in Galva, Illinois, at their risk. Paragraph 3 provides that the TIRES shall remain the property of McCORD until the EQUIPMENT to which they are affixed are sold and removed from PEARSON and IME's premises, or until paid for by PEARSON and IME in accordance with the terms of the AGREEMENT. Paragraph 3 also provides that PEARSON and IME are to provide McCORD with a security agreement evidencing McCORD's ownership and liens. Paragraph 4 permits PEARSON and IME to withdraw TIRES as needed for their production. Paragraph 5 provides that on Friday of each week, PEARSON and IME are to account to McCORD for all TIRES removed, and make payment by noon of that day. Paragraph 7 requires PEARSON and IME to give McCORD 60 days advance notice of their needs in order for McCORD to supply the TIRES needed by them. Paragraph 9 permits McCORD

to remove and sell TIRES to others so long as such removal does not substantially interfere with PEARSON and IME's needs and production requirements. Finally, Paragraph 14 provides that the AGREEMENT does not create an agency relationship.

Although the AGREEMENT calls for a security agreement, none was executed. A Uniform Commercial Code Financing Statement was executed by PEARSON and delivered to McCORD. However, McCORD never filed it with either the County Recorder or the Illinois Secretary of State.

Some time after February 1, 1988 (apparently April 20, 1988), McCORD began to deposit TIRES in the Impact Building. Some of the TIRES were removed by PEARSON and IME and incorporated into the EQUIPMENT manufactured by each. From the TIRES deposited in the Impact Building, McCORD made some sales to three of its other customers in Iowa. McCORD also used the Impact Building as a drop-shipment point for inventory that was ultimately moved to its other warehouse locations. The TIRES were carried on McCORD's inventory records and not on the inventory records of PEARSON or IME. Other than as indicated below, there was never a purchase order or invoice prepared for the TIRES, nor was there an account payable from PEARSON or IME. The TIRES were insured by McCord.

The Impact Building is located on the same tract of land as PEARSON's plant, but in a separate building, and is located about 200 yards from IME's plant. Access from the highway to the Impact Building was through a gate in a chain-link fence directly in front of the Impact Building. During the period described, the Impact Building was used for no other purpose than the storage of the TIRES. At no time was there ever a sign on or about the Impact Building to alert PEARSON and IME's creditors of McCORD's interest in the TIRES. The Impact Building was kept locked with a padlock purchased by McCORD. Of the three keys available for the padlock, one was given to PEARSON and IME's management, one was given to

an employee of PEARSON and IME, and one was retained by McCORD. When PEARSON and IME wanted to withdraw TIRES from the Impact Building, the employee would use his key to gain access and would remove the needed TIRES. This employee also had the responsibility, at the end of each week, to advise PEARSON and IME accounts payable department of the amount of TIRES that had been removed. The accounts payable department would then prepare a purchase order and remit payment to McCORD. The employee authorized by McCORD to enter the Impact Building and remove the TIRES was solely an employee of PEARSON and IME, who paid him. McCORD did not employ or pay any other person to monitor or control the TIRES in the Impact Building, or to keep records of the TIRES removed by PEARSON and IME from the Impact Building.

On October 16, 1989, an involuntary bankruptcy petition under Chapter 11 was filed against PEARSON. On October 27 and 28, of 1989, McCORD repossessed the TIRES remaining in the Impact Building. On October 31, 1989, an order for relief was entered against PEARSON under Chapter 11 of the Bankruptcy Code, and IME filed its own voluntary Chapter 11 under the Bankruptcy Code. After the Chapter 11 filings, McCORD continued to use the Impact Building, as on two occasions, October 28 and December 14, 1989, McCORD sold TIRES from the Impact Building to two of its other customers.

Subsequently, both cases were converted to Chapter 7 cases. After the conversions the trustee in bankruptcy for both PEARSON and IME, who is the same person, brought a three-count complaint against McCORD. Count I is to recover payments made to McCORD by PEARSON of $90,000.88 and by IME of $45,505.47 as preferential payments under Section 547 of the Bankruptcy Code, 11 U.S.C. Section 547. Count II involves the repossessed TIRES and is pled in the alternative. If the repossession occurred pre-petition, the Trustee alleges a preference under Section 547. If the repossession occurred post-petition, then the Trustee alleges an avoidable post-petition transfer under Section 549(a) and (b) of the Bankruptcy Code, 11 U.S.C. Section 549(a) and (b). At the time the complaint was filed, the Trustee was not sure when the repossession occurred. Those dates have now been established as being October 27 and 28 of 1989. Therefore, under Count II, as to PEARSON, the Trustee is proceeding against McCORD under Section 549, and as to IME the Trustee is proceeding against McCORD under Section 547. Count III seeks to recover the amount of the payments to McCORD made by PEARSON for TIRES sold by McCORD to IME, as a fraudulent conveyance under Section 548 of the Bankruptcy Code, 11 U.S.C. Section 548. As to Count II, the Trustee and McCORD filed cross motions for summary judgment. As to Count III, McCORD filed a motion for summary judgment.

As to Count III McCORD makes the following three alternate arguments in support of its motion for summary judgment on Count III.

1. The evidence shows that the bank account held in the name of PEARSON from which payments to MCCORD were made contained commingled funds of both PEARSON and IME. The Trustee has the burden of proving that the payments to MCCORD were made from PEARSON's funds, not IME's funds. Because the funds were commingled, the Trustee cannot establish the source of payment and cannot sustain his burden of proof.

2. Even if the funds paid to MCCORD were those of PEARSON, the payment by PEARSON gave rise to an inter-company obligation of IME to reimburse PEARSON. The creation of this obligation gave PEARSON reasonably equivalent value in consideration of its payment of IME's obligation.

3. PEARSON and IME, although separately incorporated, operated as a single economic unit. Where the party making a transfer challenged as fraudulent and the third party on behalf of whom the transfer was made are so closely connected that an "identity of interest" exists, the transfer is not fraudulent be-

cause the benefit received by the third party benefits the transferor on account of their mutual interest. Because PEARSON and IME operated as a single economic unit, any payment by PEARSON for tires sold to IME may not be avoided as a fraudulent transfer.

The Trustee contends that these arguments raise questions of fact which cannot be resolved by summary judgment. This Court agrees. These arguments raise intensely factual questions which cannot be decided on the limited information supplied in the affidavits attached to McCORD's motion for summary judgment.

Turning to Count II, it is the Trustee's contention that the transaction constituted a sale or return arrangement under Section 2–326 of the Uniform Commercial Code, Illinois Revised Statutes, ch. 26, para. 2–326 (1991), and that the Trustee's claim to the repossessed TIRES comes ahead of the claims of McCORD, as McCORD failed to protect itself in accordance with the provisions of Section 2–326. McCORD contends that the transaction was not a sale or return arrangement subject to Section 2–326, as the TIRES were owned by McCORD and had not been sold to PEARSON and IME. Therefore, the TIRES did not become property of the bankruptcy estate and McCORD was entitled to take possession of the TIRES. McCORD also takes the position that assuming that a sale did occur and Section 2–326 is applicable, the Trustee has not established that all the technical requirements of Section 2–326 have been met so as to give his claim priority over the claim of McCORD.

■ The first issue before this Court is whether the parol evidence rule precludes consideration of evidence pertaining to the oral lease for the use of the Impact Building. The Trustee contends it does. While it is unusual to consider an objection to evidence based on the parol evidence rule absent a trial, two points must be remembered. First, in this case, there is no dispute as to what occurred. The facts are agreed to. This Court has to decide the effect of those facts, specifically what was the relationship between the parties. Second, the parol evidence rule is not a rule of evidence, but a rule of substantive law. While ordinarily the rule is raised by objecting to the admission of evidence which it renders irrelevant, the evidence need not be objected to when introduced. The rule can be asserted in some other appropriate fashion, with some courts even permitting it to be raised for the first time on appeal. Calamari and Perillo, *Contracts*, Section 3–5 (2d ed. 1977).[1] That is what the Trustee has done in this case.

■ For the following reasons, this Court holds that the parol evidence rule does not prevent a consideration of the oral lease between the parties prior to their entering into the written lease. Where a contract, such as the written lease for the Impact Building, has been reduced to writing, the contract is the only evidence of its terms and conditions. All antecedent and contemporary verbal agreements are merged into it. Parol evidence is not admissible to add to, take from, or change the written terms. *Schweickhardt v. Chessen*, 329 Ill. 637, 161 N.E. 118 (1928); *Geoquest Productions, Ltd. v. Embassy Home Entertainment*, 229 Ill.App.3d 41, 170 Ill.Dec. 838, 593 N.E.2d 727 (1st Dist.1992). In this case, evidence of the oral lease is not offered to change the terms of the written lease. It is offered to show a lease relationship prior to the relationship created by the written lease and to show the overall relationship between the parties.

In this regard, the following requests to admit were submitted by the Trustee to McCORD:

Request: That shortly after February 1, 1988, McCord began to deposit inventory in the Impact Building, which inventory was removed by Pearson and IME

---

**1.** Professor Cleary, in his first edition of the *Handbook of Illinois Evidence* (1956), discussed the procedural application of the rule after noting that it was a substantive rule. Maintaining that the rule need be asserted before the trial court, he indicated that the rule could also be asserted by a motion for a directed verdict or by tender of a jury instruction. Later editions of the handbook omit a discussion of the rule.

and incorporated in products manufactured by each.

Response: McCord admits that it deposited its inventory in the impact building, denies that the same constituted "inventory" of Pearson or IME, admits that McCord's inventory was removed by Pearson and IME and incorporated in products manufactured by each, and states that McCord owned its inventory during the time that it was contained in impact building that McCord leased from Pearson and that McCord's inventory was sold to the debtors at the time it was removed and incorporated into their products.

Request: During McCord's occupancy of the Impact Building, the building was used for no other purpose than the storage of McCord tires and rims.

Response: Admitted.

Request: That although McCord began to deposit inventory in the Impact Building shortly after February 1, 1988, McCord did not pay rent to Pearson or IME for the Impact Building's use not was a written lease executed until July 25, 1989.

Response: McCord admits that the written lease was executed on or about the 25th day of July, 1989, but denies that the rent arrangement did not begin until then. From the time that McCord's lease and occupancy of the Impact Building began, the rent was always offset against freight charges.

Request: That McCord authorized personnel employed solely by Pearson and IME to enter the Impact Building and to remove inventory located therein for the purpose of incorporating it into products manufactured by those companies.

Response: McCord admits that it authorized one designated employee employed solely by Pearson or IME to unlock and enter the locked Impact Building and to remove McCord's tires and wheels located therein for the purpose of incorporation into the debtor's products.

Thus, the Trustee established certain facts regarding the relationship between McCORD and the Debtors, and while those admissions do not include an oral lease, the Trustee cannot now deny that McCORD "occupied" the warehouse and that it "authorized" one or more of the Debtors' employees access to the facility. The determination which this Court has to make is what was the nature of the relationship. Whether there was a document, or an arrangement, entitled or referred to as a lease, is not determinative.

In *Colonial Leasing Co. of New England, Inc. v. Larsen Brothers Construction Co.*, 731 P.2d 483 (Utah 1986), 3 U.C.C. Rep.Serv.2d 24, the court was trying to determine whether a document encaptioned a "lease" was in fact a security agreement. The lessee sought to introduce evidence of an oral agreement granting it an option to purchase at the termination of the lease. Speaking first to the issue of whether the statute of frauds (both the UCC provision and the general provision) applied, the court stated:

> Statutes of frauds are intended to bar enforcement of certain agreements that the law requires to be memorialized in writing. But statutes of fraud do not prevent a party from proving the true nature of the agreement of the parties when that is what is at issue rather than enforceability. (Citations omitted.)
>
> In this case, the statute of frauds did not bar [the lessee] from proving what the parties had intended, since [the lessee] sought only to obtain the protections of Article 9 of the Uniform Commercial Code, not to enforce an unwritten term of the contract. Nor was [the lessor's] action for a deficiency judgment on the lease payments an attempt to enforce the oral option against [the lessee]. (Citations omitted.)

Turning to the parol evidence rule, after noting that the trial court should hear evidence regarding the issue of whether the contract was intended to be integrated, the court stated:

> [T]he need for parol evidence is also suggested by the nature and terms of the lease itself and the surrounding circumstances.

[The lessee] also argues that the terms of the lease itself indicate that it was meant not as a true lease, but as a security agreement for the sale of property. In some cases, such a judgment may be apparent from the face of the document, but in other cases, the basic nature of the agreement, judging solely from its contents, may be ambiguous. It is the general rule that if an agreement is ambiguous because of lack of clarity in the meaning of particular terms, it is subject to parol evidence as to what the parties intended with respect to those terms. (Citations omitted.) We hold that the rule also applies where the character of the written agreement itself is ambiguous even though its specific terms are not ambiguous. (Citations omitted.)

*Colonial Leasing* was followed by the court in *Commercial Credit Equipment Corp. v. Parsons*, 820 S.W.2d 315, 17 U.C.C.Rep.Serv.2d 307 (Mo.Ct.App.1991), which stated:

[T]he true character and intention of the agreement is determined not from random phrases or formal designations— such as "lease," "lessor," "lessee," but from the economic reality of the agreement, whatever the disguise of the terminology. (Citation omitted.) In that determination of ambiguity, parol evidence may be used to show that the garb of lease notwithstanding, the transaction was intended as security. [Citing *Colonial Leasing*.]

Finally, the form of the Trustee's objection is not absolute. In his brief he seeks to exclude consideration of the oral lease, if its consideration would favor McCORD, but include its consideration if it would refute McCORD's position. The parol evidence rule is not applied in such a fashion.

■ The next issue presented by the parties is whether a sale occurred so as to subject the transaction between the parties to Article 2 of the Uniform Commercial Code. The Trustee argues a sale occurred and that the transaction was a "sale or return" subject to Article 2. McCORD argues Article 2 is not applicable as there was no sale because there was no obligation to purchase, no delivery, no acceptance, and no consideration until the TIRES were removed from the Impact Building.

McCORD's argument that before there can be a "sale or return" under Section 2–326 there must first be a "sale" as defined generally in Article 2 is simply incorrect and misses the point. There need not be a "sale" in order for Section 2–326 to apply. If the transaction meets the test of Section 2–326 it is deemed subject to Article 2 regardless of whether the definition of sale found in Section 2–106 of Article 2 is met.

The courts have rejected McCORD's contention and criticized *Walter E. Heller & Co. S.E. v. Riviana Foods, Inc.*, 648 F.2d 1059 (5th Cir.1981) which McCORD relies so heavily upon. In *Georgia–Pacific Corp. v. Walter E. Heller & Co. Southeast, Inc.*, 440 So.2d 666, 37 U.C.C.Rep.Serv. 735 (Fla. Dist.Ct.App.1983), the court stated:

A principal issue in the Riviana case, as in the instant case, was whether the goods had been delivered by Riviana to Bill Amos "for sale", since no express authority had been conferred upon Bill Amos to sell.

The Riviana case has been criticized as an incorrect interpretation of section 2–326(3) of the Uniform Commercial Code. *See* Brown, UCC Section 2–326(3): Creditor Protection in the Deemed Sale or Return Transaction, 32 Case Western Reserve Law Review 904. This court does not agree with the decision reached in the Riviana case.

The legislative history with respect to [section 2–326(3) ] indicates that a consignee's creditors are to be protected from secret reservations in ostensible ownership situations. [Official Comment 2].

Section [2–326(3) ] was enacted for the purpose of protecting the creditors of a merchant who is the apparent owner of goods located at the place of business of the merchant.

In the case of *Manufacturer's Acceptance Corporation v. Penning's Sales, Inc.*, [5 Wash.App. 501], 487 P.2d 1053 [9 UCC Rep. 797] (Wash App 1971), a paint manufacturer shipped an inventory of

paint to itself in care of a paint store under an agreement with the store owner by which the paint manufacturer reserved title to the paint which the store owner was to hold in a storage area at the rear of the paint store, subject to the manufacturer's order to ship the paint to one of the paint manufacturer's dealers in the area. For this service, the paint store was paid 6% of the amount of each order shipped or delivered to a dealer of the paint manufacturer. The paint store conducted a retail paint sales business in the front portion of the store.

The paint manufacturer contended that the agreement was simply a warehousing agreement, and that as such the goods could not be subjected to the claims of Manufacturer's Acceptance Corp., which held a perfected security interest in the inventory of the paint store. The court held that the transaction was a sale or return within the meaning of section 2–326 of the Uniform Commercial Code, since the paint store was dealing in goods of the kind involved in the inventory stored on the premises. The court went on to point out that the paint manufacturer had not rendered the sale or return provision inapplicable by establishing one of the three exceptions contained in section 2–326(3) of the Uniform Commercial Code.

The decision in *Manufacturer's Acceptance Corp. v. Penning's Sales, Inc.*, *supra*, demonstrates that the Uniform Commercial Code disregards the intended character of the transactions between the parties and treats a transaction as a sale or return when goods are delivered to a person who maintains a place of business at which he deals in goods of the kind involved under any name other than that of the person making delivery.

In discussing whether Section 2–326 applied where the "consignee" lacked express authority to sell the goods, the court quoted from *In re Novak*, 7 UCC Rep.Serv. 196 (Md.Cir.Ct.1969):

"Although certain transactions may not be sales under Section 2–106(1) [of the Code] they are 'deemed to be on sale or return with respect to claims of creditors of the person conducting the business' ... [T]o answer the issues raised by respondent that Debtor was not a buyer, ... this court does not feel that it is improper to give broader application to Section (3) [2–326(3)] to include transactions in which goods are delivered at least in great part for *ultimate sale*. It is reasonable to assume that a general creditor has protection under the provisions whether his debtor had authority to sell all, part or none of the goods. Such an interpretation, consistent with the intent of the framers of the Uniform Commercial Code, would protect creditors of unstable consignees who act as delivery and collection agents. It would comport with Uniform Commercial Code, section 2–403(2), which provides that a merchant in possession of goods of the kind in which he deals can, in the ordinary course of business, transfer ownership to a buyer."

The court continued:

The agreement between Defendant and Bill Amos refers to consigned merchandise. Although Defendant has argued that the transactions in question were only storage and warehousing agreements, the court, in *In re Novak*, *supra*, after finding that the correspondence between the parties referred to the goods as "consigned stock" and "consigned inventory," held that use of the term "consigned" would be deemed to have the meaning associated with a general commercial transaction. The court stated:

"The term 'consignment' used in a commercial sense, ordinarily implies an agent, and denotes that property is committed to the consignee *for care or sale*."

Just as the existence of an undisclosed interest in goods does not prevent passage of title pursuant to [section 2–403(2)], neither should a hidden interest prevent the enforcement of a security interest in goods delivered "for sale", whether the sale was to be made by the supplier or by the person to whom the goods were consigned.

In the case of *Vonins, Inc. v. Raff,* [101 N.J.Super. 172], 243 A2d 836 [5 UCC Rep. 433] (NJ Super 1968), an installer of plumbing and heating apparatus assigned his installation contracts to Vonins, pursuant to an agreement whereby Vonins agreed to engage Crest as its subcontractor for the assigned contracts and for any other installation contracts obtained by Vonins. Vonins furnished Crest with supplies and materials needed to complete the contracts, and Crest was to receive 40% of the total contract price for its labor services. Raff, an assignee for the benefit of creditors of Crest, claimed a superior interest to that of Vonins in the materials and supplies found at Crest's warehouse.

Vonins claimed that it merely stored and warehoused the goods at Crest's place of business, and that section 2–326(3) of the Code was not applicable because Crest did not engage in selling the goods delivered by Vonins. In ruling that section 2–326(3) of the Code was applicable and that Vonins' interest was subordinate to the interest of Raff, the court stated:

"Further we do not deem it to be a prerequisite to Code application that Crest have been engaged at premises in over-the-counter retail selling of plumbing equipment. Before the 1963 agreement, Crest installed this equipment, purchased from Elite, for various builders and developers. Thereafter, it continued to do the same with the equipment it obtained from Vonins. At all times in which Crest was engaged in operations, it performed the same method of distribution of equipment from manufacturer to ultimate user. Clearly, Crest maintained a place of business at which it dealt 'in goods of the kind involved.' Even though an overall price would be charged for the installation of the equipment, it cannot be denied that the price of the equipment installed was a distinct component of that consideration. Thus, plaintiff delivered goods to Crest 'for sale' to others. That resale need not have been consummated at Crest's premises for the statute to apply."

Just as in Vonins, Bill Amos was providing a component part of the total sales transaction, for which it was paid a percentage of the overall consideration. The consignment of paper goods by Defendant to Bill Amos was to facilitate sales transactions and was thus "for sale" within the meaning of section [2–326(3)].

In the case of *Bischoff v. Thomasson,* 400 So 2d 359 (Ala 1981), the Alabama Supreme Court held that the test to be applied in consignment cases:

"... is simply one of looking at the outwardly visible aspects of the transaction outlined in [section 2–326(3)], viz:

(1) delivery of possession to the consignee,

(2) engaging in the business of selling such types of items by the consignee, and

(3) failure of the consignor to give public notice of his retained interest in the goods."

Support for the conclusion that a sale is not required for Article 2 to be applicable can also be found in Section 2–102, which provides as follows:

Unless the context otherwise requires, this Article applies to transactions in goods; ...

Although commonly referred to as the article on sales, Article 2 is not limited to sales and has a broader scope including transactions in goods. *See* White & Summers *Uniform Commercial Code,* Section 1–1 (2d ed. 1980). The transaction between the parties was certainly a transaction in goods.

■ The next issue is whether Section 2–326 is applicable to this transaction. That section begins by stating:

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

(a) a "sale on approval" if the goods are delivered primarily for use, and

(b) a "sale or return" if the goods are delivered primarily for resale.

In the context of this case, that section asks three questions. One, were the TIRES delivered. Two, could PEARSON and IME return them even though they conformed to the contract. Three, were the TIRES delivered for use or resale. If the first two questions are answered in the affirmative, and the third is answered by a finding the TIRES were delivered for resale, Section 2–326 is applicable. They are.

In *Matter of KLP, Inc.*, 7 B.R. 256 (Bkrtcy.N.D.Ga.1980), the court dealt with the issue of whether goods had been "delivered" for sale where the consignor had entered into an oral lease with the consignee to store the goods while the consignee tried to find a buyer. Finding that the goods had been "delivered for sale" the court stated:

> In its affidavit filed in response to Defendant's motion, Plaintiff admitted that the original oral storage agreement was modified to allow the debtor to solicit offers from third parties to purchase the organs. While such an offer was not to be accepted on Plaintiff's behalf by Defendant until Plaintiff consented, the court considers the organs to have been delivered "for sale," UCC section 2–326(3), since the debtor was authorized to solicit offers. Under these circumstances, one of the purposes behind section 2–326, to subordinate secret consignment seller claims to claims made by creditors of consignment buyers, is indeed implicated. The statute simply seeks to protect those entities which extend credit to consignment buyers from the secret claims of consignment sellers, and an analogy may be drawn between the treatment thereby afforded such innocent creditors and the treatment afforded perfected lienors vis-a-vis unperfected lienors under article nine of the UCC.

The most instructive decision on this issue is *In re Flo–Lizer, Inc.*, 946 F.2d 1237, 15 U.C.C.Rep.Serv.2d 1198 (6th Cir.1991). In that case, Ciba–Geigy shipped herbicide to the debtor, Flo–Lizer. According to the bills of lading, Ciba–Geigy shipped the herbicide to itself, in c/o Flo–Lizer. The herbicide was kept in sealed tanks at Flo–Lizer's place of business. Ciba–Geigy paid Flo–Lizer storage and incentive payments. Under the terms of their agreement, Flo–Lizer's purchase of the product would be consummated upon either Flo–Lizer's request to be invoiced for the products or by Flo–Lizer unilaterally breaking the seals on the tanks in which the herbicide had been placed. (District Court opinion @ 121 B.R. 324 (S.D.Ohio 1990). The findings of fact made by the bankruptcy court included the following:

> CIBA–Geigy asserts that the purpose of the delivery was not for the sale of goods, but for warehousing needs of CIBA–Geigy. The facts do not bear this out. First, CIBA–Geigy employed sales persons that encouraged Flo–Lizer to receive goods. If the arrangement were purely warehousing, one would assume Flo–Lizer would lobby CIBA–Geigy for their warehousing needs, not vice-versa. Secondly, the quantity delivered to Flo–Lizer was not determined by the warehousing needs of CIBA–Geigy, but the sales needs of Flo–Lizer. When CIBA–Geigy ships the amount of goods that Flo–Lizer calculates it can sell, the shipment appears to the world to be for sale. CIBA–Geigy also points out that a warehousing fee was paid to Flo–Lizer. This fee amounted to no more than a sales incentive, for it was testified at trial that the fee payment would continue even after CIBA–Geigy would have considered the goods sold."

On appeal, the 6th Circuit stated:

> [UCC Section 2–326(3)] protects the interests of unsuspecting third parties who might extend credit to a firm in the belief that it had the power to convey, if and when needed, a security interest in goods obtained and stored as described in [this provision.] Indeed, where a firm keeps on its premises goods of the kind that the firm typically sells under a name different from the name of the firm's supplier, a prospective third-party creditor quite logically infers on the basis of appearances that the firm has the power

to convey an interest in the goods as security for a loan. Section 2–326 furthers the Uniform Commercial Code goal of efficient commercial transactions by allowing all prospective creditors to safely rely on this logical inference without first undertaking time-consuming and costly searches for secret agreements purporting to deprive the firm of the power to subject such goods to third-party claims.

The section specifically provides that its terms control despite any agreement purporting to reserve title to the supplier until payment or resale, and despite any agreement using phrases such as "on consignment" or "on memorandum." In our view, this provision underscores the Uniform Commercial Code principle that clandestine artifices do not provide third parties with fair and binding notice of a supplier's intent to deprive a firm of the power to subject goods at its place of business to creditors' claims. Of course, potential creditors will have fair notice of such agreements where the supplier causes the firm to display a legally required sign revealing the agreement, where the firm is generally known by its creditors to be in the business of selling property not its own, or where the supplier files a notice in the appropriate record office(s). Accordingly, section 2–326 denies protection to third-party creditors who extend credit under such circumstances in reliance upon a potential claim to the goods.

In short, section 2–326 "resolves all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer." Significantly, the section operates to protect a firm's unsuspecting third parties even though the firm may never have obtained an ownership interest in the goods. Here Ciba–Geigy failed to take any of the statutorily specified actions to provide [other creditors] with fair notice that they could not safely rely upon the herbicide as security, or potential security, for credit extended to Flo–Lizer. Consequently, under the facts as stipulated and as found by the bankruptcy court after tri-

al, section 2–326 applies directly and dictates that the herbicide (or its proceeds) stand subject to the claims of Flo–Lizer's creditors as part of the bankruptcy estate. (Citations omitted.)

Rejecting Ciba–Geigy's argument that it continued to possess the herbicide under the provisions of the bills of lading and thus Section 2–326 did not apply because the herbicide was never in the "buyer's possession" as required under that provision, the court ruled that Section 2–505, relied upon by Ciba–Geigy, was not intended to limit the rights of third parties and was not applicable, and continued:

> Moreover, since the code provides no definition of "possession," the word as used in section 2–326 must refer to possession as commonly understood by commercial actors, not "possession" in some hypertechnical sense implied by the phrase "reserves possession ... as security," which appears in a section addressing buyer-seller conflicts unrelated to section 2–326 concerns. Additionally, section 2–326's purpose is to protect the rights of third parties, and it thus is likely that the drafters used the term "Possession" to signify something readily observable by reasonably cautious third parties.
>
> The specific language of the non-negotiable bills of lading, plainly contrived in anticipation of litigation, is not readily verifiable by third-party creditors and therefore does not determine the issue of possession. By contrast, the presence of the herbicide in tanks owned or leased by Flo–Lizer, on land owned or leased by Flo–Lizer, free of any disclaimers regarding Flo–Lizer's ownership, was readily observable by prospective third-party creditors and therefore governs the issue of possession.

Citing White and Summers in a footnote, the court quoted:

> "Traditionally, possession of encumbered personal property has been important *because of the notice it gives to prospective creditors* ... Fortunately, [taking possession to perfect a security interest] is now restricted largely to circumstances in which the creditor's possession

will be unmistakable (for example, the bank puts debtor's valuables in creditor's vault) ... "Occasionally creditors argue that debtors possess on [the creditors'] behalf. This argument has been uniformly and properly rejected, for ... *the debtor ... [will not] give adequate notice and protection by his possession."*

The district court, quoting the bankruptcy judge, and then adding a comment of its own, deals best with any argument that the facts of the above cases are not exactly those in the present case:

"In debtor-creditor law, there has always existed a basic problem concerning a seller's right to reclaim goods delivered to an unpaying buyer. The problem becomes further complicated when the buyer becomes insolvent and seeks protection under the United States Bankruptcy Code. When the buyer-debtor is transformed into a debtor-in-possession, the seller is particularly vulnerable, because the law seeks to also protect any innocent third-party creditors who may have relied on the apparent inventory of the debtor.

"Sellers and creditors have devised various legal theories to protect their interest in such goods including factor (sic) liens, conditional sales and entrustment, but the underlying problem of deceiving other creditors of the debtor survives these theories. The Uniform Commercial Code, which has in large part been adopted in Ohio attempts to give all parties in such situations, methods to protect themselves in the event of legal complications. For unknown reasons, sellers and creditors are still inventing new legal theories, which in part seek to circumvent the requirements of the UCC." (Slip op. p. 3–4). It is the position of this court to preserve the integrity of the Uniform Commercial Code. This court will not sanction attempts to circumvent the U.C.C. This has the potential of depriving parties to a transaction the assurance of methods by which they can protect themselves in the event of legal complications. To do otherwise would destroy proper application of the U.C.C. and its underlying purpose to provide a consistent framework for commerce.

Returning to the facts of the case before this Court, the TIRES were located on PEARSON's property in the Impact Building. PEARSON's and IME's employees had keys and access to the Impact Building. These employees controlled the tires in the Impact Building. They received them and they removed them as the requirements of PEARSON and IME dictated without any consultation with, or permission by, McCORD. These indicia of control would not be present absent delivery.

McCORD takes the position that there was no delivery as the TIRES were not in the debtor's possession, as the lease arrangement put the TIRES in McCORD's possession. The fact that there was a lease arrangement is one element to be considered. But the existence of the lease arrangement is not too difficult to disregard because the lease arrangement just doesn't reflect the true nature of the way the parties were conducting business. McCORD never paid any rent. As stated by Ross Fischer, McCORD's President and Chairman of its Board of Directors:

There was never any agreement on my part to pay cash rent of $300 per month or any cash rent. The benefit of our rental of the Galva warehouse to Pearson and IME was that the price of tires shipped direct from Goodyear would be reduced and the items located in the warehouse would be available if they chose to purchase the items without any time delay for shipping.

The written lease was entered into when the parties recognized the difficulties PEARSON and IME were encountering. When deposed, Michael Gibbons, President of both PEARSON and IME during the relevant time periods, stated that by entering into the written lease the parties' relationship or conduct was not altered or changed in any way. Speaking to the reason why a written lease was drawn and entered into, Gibbons replied:

I have to explain to you that we were in an adverse situation with Fremont Finan-

cial. Any inventory on the property they felt they had a claim to. And it was in everybody's mind here that when the 11 came down, we were within days, within days of paying off this damn bank. We needed this inventory, access to this inventory. So, Ross wanted the security that that is my inventory. This is another way of getting it.

McCORD also takes the position there was no agreement the TIRES could be returned. McCORD does not contend that should the arrangement cease that it was not contemplated that the TIRES would be physically removed from the Impact Building and the control of PEARSON and IME's employee. That is the import of Paragraph 12 of the AGREEMENT which provides that

"Immediately on such expiration or termination, consignee [PEARSON and IME] shall deliver to consignor [McCORD] all tires and other goods hereunder that remain in consignee's possession or control."

The actions of McCORD also indicate the parties contemplated a return of the TIRES. Once PEARSON and IME were in bankruptcy, McCORD took possession of and control over the TIRES.

Rather McCORD takes the position that as there was no sale or delivery to PEARSON and IME, there could be no return. Stated differently, as McCORD did not give up possession, nothing could be returned to it. But as previously noted, its premise is faulty, as a sale is not required and a transfer of possession to PEARSON and IME did occur. As the premise fails, so does the contention.

■ McCORD also argues that PEARSON and IME were not retail dealers of TIRES and the TIRES were not delivered primarily for resale. The fact that PEARSON and IME were not in a retail business of selling tires puts an unusual twist on this case. But they were in the retail business of selling equipment which included the TIRES. The few cases that have touched on the sale of component parts have rejected McCORD's theory. *See BFC Chemicals, Inc. v. Smith–Douglass, Inc.,*

46 B.R. 1009 (D.C.N.C.1985) and *In re Ateco Equipment, Inc.,* 17 B.R. 230 (Bkrtcy.W.D.Pa.1982.) McCORD has not cited any authority to the contrary, and hasn't submitted any reason why the sale of a component part should not be covered by Section 2–326. If McCORD permitted PEARSON and IME to hold out to the world that the TIRES belonged to them and the TIRES were incorporated into equipment which was resold, there is no reason why McCORD shouldn't be treated the same way as a retail seller of just the TIRES themselves.

■ Finally, McCORD takes the position that the parties were taking advantage of the excepting language of Section 2–326(1) and "otherwise agreed". Neither the AGREEMENT nor the written lease support that position.

The AGREEMENT, if anything, is detrimental to McCORD. In fact, McCORD now wishes to reject it. At the hearing on the motions for summary judgment, McCORD had this to say with regard to the AGREEMENT:

The consignment agreement has been represented by the trustee to be a contract for sale, a requirements contract, a needs contract, whatever you want to call it. My argument is that it's not a contract at all because there's no obligation on IME or Pearson to do anything. I'm not going to defend the drafting of that document. I think if my client were here, he would say that that is a terrible document and he regrets the day it came into existence, and it is a lousy document. It's mislabeled. It's labeled as a consignment agreement when—when this is not a consignment relationship. It's a document that places no obligation on the debtors to do anything. It's not—it's not even a binding contract because the debtors are not obligated to do anything; to pay anything, to buy anything. There's no obligation whatsoever. It's a lousy document, and the reason we're here is because it's a lousy document. I'll admit that. I'm not going to try to defend it, but I am going to defend my interpretation of that docu-

ment and my interpretation of the facts generally because my interpretation is correct.

This Court would agree that the AGREEMENT is not well drafted. Whether it was ineptly or intentionally drafted that way, isn't known. Historically, courts have faced problems with trying to distinguish between a consignment and a sale or return. As the Illinois Code Comments to Section 2–326 indicate:

The problem of whether a particular transaction is a "sale or return" or a "consignment" transaction in which the seller retained title is one that has plagued the courts for years. The problem has been complicated by the fact that some sellers have drawn deliberately ambiguous agreements. There is, for example, the famous Arbuckle Bros. series of cases, in which the courts of last resort of Georgia, Tennessee and Virginia considered the same agreement within in a span of two years. *Snelling v. Arbuckle Bros.*, 104 Ga. 362, 30 S.E. 863 (1898); *Arbuckle Bros. v. Kirkpatrick*, 98 Tenn. 221, 39 S.W. 3 (1897); *Arbuckle Bros. v. Gates & Brown*, 95 Va. 802, 30 S.E. 496 (1898). Under this agreement a manufacturer of roasted coffee appointed a firm as its "special selling factors" to handle its goods. Despite frequent use of the word "factor" in the agreement all three courts held the agreement one of sale and not agency. Of the agreement the Supreme Court of Georgia remarked (104 Ga. at 365, 30 S.E. at 863:

"... It appears to have been drawn for the purpose of enabling Arbuckle Bros. to 'run with the hare, or hold with the hounds,' according as, in the exigencies of a given case, their interests might dictate,—on the one hand, to hold Allen absolutely bound, in any event, to pay for all goods shipped to him by the Arbuckles; on the other hand, in the event of his failure to pay and his insolvency, to enable them to successfully claim all unsold goods in Allen's possession, and the accounts, or their proceeds, against his customers, representing goods which he had sold, but for which he had not paid Arbuckle Bros."

The AGREEMENT, which contains language that refers to a security agreement and the creation of a lien in favor of McCORD, indicates the parties intended to enter into a secured transaction governed by Article 9 of the Uniform Commercial Code. The failure to create or perfect a security interest in the TIRES places McCORD in the position of an unsecured creditor with no claim to the TIRES. McCORD did receive a UCC–1 Financing Statement which it failed to file. This fact indicates the parties intended to either create a security interest, or to comply with Section 2–326(3)(c) which provides that a transaction is not deemed a sale or return if the filing provisions of Article 9 of the Uniform Commercial Code are complied with.

Admittedly, there is other language in the AGREEMENT indicating a consignment. For example, McCORD had the right to, and did, sell TIRES to third parties. However, those sales could only be made if they did not adversely impact the use of the TIRES by PEARSON and IME. Clearly PEARSON and IME had first call on the use of the TIRES. But as courts have noted, under Section 2–326, specifically as provided in Comment 2, all reasonable doubts regarding the nature of the transaction are to be resolved in favor of the debtor's general creditors. *In re Castle Tire Center, Inc.*, 56 B.R. 180, 42 U.C.C.Rep.Serv. 862 (Bkrtcy.W.D.Pa.1986).

Nor does the written lease provide the basis for this Court to conclude that the parties were otherwise agreeing to a relationship which is favorable for McCORD. As previously noted, the written lease is easy to disregard. There was never any intent that all its terms were to be enforced, and they were not enforced. Furthermore, the stated reason for the written lease was to provide McCORD with a security interest in the inventory of TIRES. This stated reason is consistent with the language in the AGREEMENT which re-

928

fers to the creation of a lien in favor of McCORD.

Having concluded the transaction is subject to Section 2–326, the effect of that section must be determined. Subsections (2) and (3) provide as follows:

(2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Article on Secured Transactions (Article 9).

Under subsections (2) and (3), if the TIRES are deemed to be a sale or return, the TIRES are subject to the claims of PEARSON and IME's creditors, unless the third sentence of subsection (3), which afforded McCORD a means of protection, leads to a different result. It doesn't.

As the Illinois Code Comments to Subsection 2–326(3) indicate, the following three elements must be present before the TIRES in the possession of PEARSON and IME can be regarded as a sale or return:

1. The TIRES must be delivered to PEARSON or IME for sale.

2. PEARSON or IME must maintain a place of business at which they deal in TIRES; and

3. PEARSON and IME must deal in a name other than McCORD.

The TIRES were delivered to PEARSON and IME for sale as component parts of the EQUIPMENT. PEARSON and IME maintained a place of business at which they dealt with the TIRES, under their name and not McCORD's. For the reasons previously stated, the fact the TIRES were only component parts to the EQUIPMENT being sold by PEARSON and IME does not prevent the application of Section 2–326(2) and (3).

McCORD also relies on the fact that it reserved title to the TIRES. But subsection (3) is clear that it is applicable even though the AGREEMENT reserved title in McCORD.

Finally, subsection (3) provides it is not applicable if McCORD had taken any of the following three acts:

(1) Indicated its interest through a sign. This approach is not available to McCORD as there is no Illinois law which protects McCORD if it had used a sign. *See* the Illinois Code Comments to Section 2–326. But even if the Illinois law was otherwise, McCORD receives no protection as it didn't use a sign.

(2) Establish that PEARSON and IME were generally known by their creditors to be substantially engaged in selling the goods of others. Here, McCORD argues that PEARSON and IME's creditors knew what was going on, asserting that this was established in another action brought by the trustee against another creditor. *See In re Pearson Industries, Inc.,* 142 B.R. 831 (Bkrtcy.C.D.Ill.1992). A review of the record and this Court's opinion in that case fails to substantiate McCORD's assertion. In fact, this Court held in that case "There was no proof that Debtor's creditors generally knew Debtor was engaged in selling Riverside's goods." It is only after that litigation was over that other creditors pos-

sibly became aware of the nature of how PEARSON and IME were doing business.

(3) There was no compliance with the filing provisions of Article 9 of the Uniform Commercial Code. As previously indicated McCORD took the Uniform Commercial Code Financing Statement but failed to file it.

For these reasons, this Court concludes that the transaction between PEARSON and IME and McCORD was subject to the provisions of Section 2–326 of the Uniform Commercial Code, and that the Trustee's claim to the repossessed TIRES comes ahead of the claims of McCORD. However, that holding does not resolve all the issues between the parties. Both the attorney for the Trustee and the Attorneys for McCORD have advised this Court that if the Trustee prevails on the question of liability, an issue of damages remain. The issue is whether the damages should be computed based on the price list attached to the AGREEMENT, or cost.

There is one other point which the parties need to clarify during the course of the further proceedings in this adversary. In the Trustee's motion for summary judgment, as to Count II, reference is made to preferential (or post-petition) repossession totaling $200,973.41. Count III for a fraudulent conveyance is for that same amount. In arguing the motion for summary judgment, the Trustee referred to alternate relief. Because the dollar amounts in Count II and III were identical, this Court believed that the alternative relief being sought was between Counts II and III. Upon reviewing the pleadings and the brief, it now appears that the alternate nature of the relief being sought is under Count II only and involves Section 547 and 549 of the Bankruptcy Code. This Court is still confused as to how the dollar amount could be exactly the same as Count II involving repossession and Count III involving payment.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

ORDER

For the reasons set forth in the Opinion entered this day;

IT IS, THEREFORE, ORDERED:

1. McCORD's Motion for Summary Judgment as to Count III is DENIED.

2. The Trustee's Motion for Summary Judgment is ALLOWED as to liability under Count II; and

3. McCORD's Motion for Summary Judgment is DENIED as to liability under Count II.

4. The Clerk of the Court is directed to schedule an additional pretrial conference as to Counts I, and III, and as to damages under Count II, and the parties are directed to file a supplemental pretrial statement in accordance with the Opinion entered this day.